## No. 13,930.

|107 355|
|114 995|

107 355
f118 4
118 819
120 1023

## THEOVILLE LeBLANC AND WIFE vs. DANIEL E. SWEET, ET AL.

### SYLLABUS.

1.  A common carrier is bound to exercise the strictest diligence in receiving a passenger, conveying him to his destination, and setting him down safely, that the means of conveyance employed and the circumstances of the case will permit.

2.  There is a broad difference between the obligations of a carrier, to a passenger, and his obligations to a third person, complaining of tort; the burden of proof, in the latter case, save where otherwise provided by statute, resting upon the claimant, to establish both the injury and the negligence which caused it; whereas, in the former case, it is sufficient, in order to throw the burden of explanation on the carrier, for the passenger, suing on a contract for personal carriage, to establish the contract, and to show that he has not been safely set down at his destination. It is, then, for the carrier, and not the passenger, to show what negligence, and whose, prevented the fulfillment of the contractual obligations of the carrier. '

3.  Where a girl takes passage on a steamboat and is drowned upon reaching the point at which she expected to leave the boat, in an attempt to transfer her to a skiff, the burden of proof rests on the carrier to show that such occurrence did not result from the fault of his officers or representatives.

4.  There is danger in attempting such transfer, at night, and whilst the boat is in motion, of which the carrier ought to be aware, and to which he has no right to subject an ignorant and inexperienced passenger, and, in so doing, he assumes the risk of the consequences.

5.  The damages recoverable by the surviving parents, for the loss by drowning of their daughter, a girl of sixteen, may include expenses incurred in finding and burying the body, loss of services and of filial offices, as also the amount which the daughter, herself, was entitled to recover, at the moment of her death.

6.  Where an action in damages is brought against the owner, and also the master, of a steamboat, and it appears that, in the transaction out of which · the action arose, the master was acting in his representative capacity, the owner, alone, is liable.

A PPEAL from the eighteenth judicial district, parish of Acadia—
*DeBaillon, J.*

*Story & Pugh* and *Thomas R. Smith,* for plaintiffs, appellants.

*Philip J. Chappuis (John D. Grace,* of counsel), for defendants,
·appellees.

The opinion of the court was delivered by

MONROE, J. Plaintiffs, who are husband and wife, sue Daniel E.
Sweet, as owner, and Henry L. Sweet, as master, of the sternwheel
steamboat "Olive," for damages, alleged to have been sustained by rea-
son of the drowning, through the negligence of the defendants, upon
the night of July 4th, 1898, of their minor daughter, Helen, a young
girl of sixteen. The defendants deny that they were guilty of negli-
gence, and allege that the death of the minor was brought about by her
own imprudence.

It is beyond controversy that the plaintiffs reside upon the Bayou
Queue de Tortue, twelve miles above the point at which it enters Mer-
mentau river; that, reckoning from the same point, the town of Mer-
mentau is situated about twelve miles up, and the town of Lake Arthur.
upon a lake of that name, about six miles down, that river; that, upon
the 4th of July, 1898, a young man named Valsin Stutes, with four
young ladies, viz: his two sisters, Azelda and Elizabeth, Miss Amanda
Aube, and Miss Helen LeBlanc, went, by skiff, from the LeBlanc resi-
dence to Lake Arthur, to participate in celebrating the day; that, at
Lake Arthur, they met Adam Simon, who invited them to return, as his
guests, as far as the mouth of the Bayou Queue de Tortue, on the
steamboat Olive, which, at the close of the day, was to carry a number
of excursionists from Lake Arthur back to the town of Mermentau, and
that they accepted the invitation, and boarded the boat, by which their
skiff was taken in tow; that, about ten o'clock that night, and on, or
just before, reaching the mouth of the bayou, a "slow bell" was rung,
Valsin Stutes got into the skiff, followed by his sister, Azelda, and Miss
Aube, and then by Miss LeBlanc, and that, when Miss LeBlanc got in,
the three young ladies were precipitated into the river, with the result
that Miss LeBlanc was drowned.

With regard to other facts and circumstances, there is considerable
conflict in the testimony. The theory propounded by the plaintiffs is,

that it was understood between Adam Simon and the captain of the boat, that Simon and his friends were to be transferred, upon reaching the mouth of the bayou, to their skiff, and that, as they were about reaching that point, the boat was slowed down and the party were notified to get into the skiff, the bow of which was held alongside the boat by Harrington, the fireman, and the stern, by Sweet, who was acting in the double capacity of master and engineer, but that the boat, which had been making seven miles an hour, was only slowed to about half speed, and that its continued movement, the agitation of the water, and the consequent tendency of the skiff to get under the "guards" of the boat, rendered such a mode of transfer exceedingly dangerous, especially at night, and that the officers of the boat ought to have known, whilst Miss LeBlanc, and some other members of the party, having never before been on a steamboat, were ignorant of, the danger. The theory of the defense, upon the other hand, is, that it was the intention of the officers of the boat to make a landing upon the river bank, upon the lower, or down stream, side of the mouth of the bayou, and that whistles had been blown, signal bells rung, and the boat slowed down, with that view, but that the young ladies, of their own accord, or, at the instance of their escorts, and without the knowledge of the officers, undertook to get into their skiff, in the manner, and with the result, as stated.

Plaintiffs' theory is supported by the following positive and affirmative testimony, which we recapitulate, in substance, to-wit: Adam Simon testifies that his friends, having come, by skiff, from their homes, on the Queue de Tortue, to the town of Lake Arthur, he met them at the latter place; that the "Olive," having brought a party of excursionists (the witness among them) from Mermentau, and being about to proceed further on Lake Arthur, he took his friends on board, and, whilst on board, asked the captain if he would take them, as the boat returned to Mermentau and put them, and him, off at the mouth of the bayou, informing the captain that they had their skiff, asking him to tow it to the mouth of the bayou, and stating that they would there get into the skiff, from the boat, and thus reach heir homes; to all of which the captain gave his assent; that about ten o'clock that night, the party being on the boat, and the boat on the way to Mermentau, the pilot, or some one else connected with the boat, notified him that the mouth of the bayou was "right around the bend," and that he and his party had better get ready, and that he, accordingly, took the ladies down stairs, *i. e.,* from the boiler, or cabin, deck, to the lower, or main deck, in order

that they might be ready to get off; that Valsin Stutes got into the skiff, which was alongside, and held it, and that Harrington, the fireman of the boat, also held the skiff, at the bow, whilst Sweet, the captain, held it at the stern, and that Harrington said "get in"; that he, the witness, then turned to speak to some one near him and did not observe how the ladies got into the skiff, but that he heard a noise and found that they had fallen into the river, and that he and the captain pulled Miss Aube out, and took her to the engine room, whilst Valsin got his sister out; that he then found that Miss LeBlanc was missing, and he went into the water and swam around searching for her, but without success; that, at the moment of the accident, the boat was in the middle of the river (which is about one hundred yards wide), immediately opposite the mouth of the bayou, with her bow pointed straight up the river, and, though the engines had stopped, was still in motion, and "was driving pretty fast, so that Miss Aube's dress was flying through the water, and they had to pull to get her into the boat." The witness further testifies that the boat made no landing at the mouth of the bayou, but that, when the search for Miss LeBlanc was abandoned, he and his friends went off in their skiff.

Valsin Stutes testifies that no one told him that it was time to go, but that (knowing it himself, as we understand his testimony) he got into the skiff to bail the water out; that Harrington unfastened the skiff and held it, by a chain, at the bow, whilst Sweet held the stern, and that Harrington, twice, told the ladies to get in; that his sister, Azelda, and Miss Aube got into the after part of the skiff and Miss LeBlanc into the forward part, and that he is unable to say how the accident happened, save that the skiff tilted and they went overboard; that Sweet and Simon assisted Miss Aube out, whilst he helped his sister; that the boat was opposite the mouth of the bayou, moving slowly, though the engines had been stopped; and that there were somes waves, making the water a little rough.

Mrs. Simon, who was then Miss Azelda Stutes, testifies, that she and the others went down to get into the skiff, at the suggestion of Adam Simon, and that they found two men holding the skiff, one, (whom she identified as Harrington) by a chain attached to the bow, and the other, (whom she identified as Sweet, but only from information obtained afterwards) holding the stern, and that Harrington, twice, told them to get in; that Valsin was already in the skiff, and that she was the first of the young ladies to get in, and was followed by Miss Aube, and, then,

by Miss LeBlanc; and that, when the latter got in, the skiff tilted and they were precipitated into the water, from which she was taken by her brother and Simon, and Miss Aube, by Simon and another man. She testified that Miss LeBlanc was very heavy, and she gives it, as her opinion, that if Miss LeBlanc had gotten in easily they would not have been thrown out, though she also states that she and Miss Aube were standing and that there were some waves.

Miss Elizabeth Stutes testifies that she and the others went to the side of the boat, to get into the skiff, at the suggestion of Adam Simon, and that there was a man holding the bow of the skiff and another holding the stern, but she does not undertake to say who the men were. She further states that she was looking elsewhere and did not see who got into the skiff, or the order in which they got in; that her attention was attracted only when she heard them in the water, and that she did not see who took her sister and Miss Aube out.

The theory propounded by the defendants is supported by the following testimony, also given in substance, to-wit: Henry L. Sweet testifies that he was acting as both master and engineer of the "Olive"; that Simon had asked him to let his party off at Bayou Queue de Tortue, but had said nothing as to the manner of debarking, and that he is unable to say that he knew that they expected to get ashore in their skiff, but that he knew, because they told him, that they lived on bayou Queue de Tortue; that they did not take the skiff with them on the lake, but, on the return of the Olive to the town of Lake Arthur, and before starting to Mermentau, he had it made fast to the port side of the boat, and was aware that it was being towed; that he notified the pilot that there were some ladies to be "let off," at the mouth of the bayou, and, whilst he did not tell him, in words, to make a landing directly on the shore, it was his intention that such a landing should be made, on the point on the lower side of the bayou; that, a short distance below the point mentioned, three whistles were blown, which indicated that the boat was about to make a landing, and that, so far as he knows, the boat was proceeding in the ordinary way to make a landing, though he does not know how she was heading when the accident occurred; that he received a "slow bell" just before the accident, and shut off steam, in part, but that it is hard to tell whether the speed of the boat had been diminished, as a boat will run quite rapidly, from acquired momentum, for a full minute after steam is shut off; that he was still in the engine room when he heard the screams which indicated that the accident had hap-

pened, and that he, then, shut off steam, entirely, stopped and reversed his engine and ran out and caught hold of one of the ladies, at the rear end of the skiff, and that he was among the first to get there; that he did not shut off steam after he had rendered this assistance, but that he then ran and stopped his engine, which he had before reversed; and thereafter he does not seem to know very clearly what took place, as he is unable to tell how long he stayed in the engine room, or what became of the ladies who were taken out of the water, save that they, eventually, went off in their skiff, without his knowledge. The witness further states that he considers it part of the duty of the captain to see that passengers are safely landed, but that he usually has others to attend to that duty; that, on the night of the accident there were employed on the "Olive," besides himself, a pilot, a fireman, a negro cook, who also acted as deckhand, and two men, Maignaud and Hoffman, whom he had engaged to help him; that he notified Simon, about fifteen minutes in advance, that they were approaching the bayou; that the boat, at the time of the accident, was just below the mouth of the bayou; that the boiler is located forward and the engine aft, with about sixty feet between, and that the skiff, from which the ladies were thrown, was made fast a little forward of the middle of the boat. He states that the guards of the boat extend about four feet beyond the hull on each side, and are about twelve or fourteen inches above the surface of the water, and that, as a general thing, it would produce no effect, other than to lower the skiff in the water, to force it under the guards, but that if a person stepped into the skiff and it caught the guards it would throw the person out. He further testifies that it would have been no trouble to make a proper landing, and he also says that on the lower river it is quite customary to take people off and on by means of skiffs, and that it is not dangerous, "if they will only let the boat come to a standstill."

Louis H. Michon was the pilot of the Olive. He testifies that he was told by Captain Sweet, before leaving Lake Arthur to stop at the Queue de Tortue, as they had some ladies to let off; that he knew that if they had ladies to let off they had to make a landing; that, after leaving Lake Arthur, Simon came to the pilot house and asked him to stop, because he had ladies to take off, and that he replied that he would take no orders from him and that he had better go to the captain,—that it was no use to ask for a "slow bell," but that he did not tell Simon that he had already received orders from Sweet; that when

they came near the bayou he blew three whistles, for a landing, and that he would not have blown for a stop in the middle of the river; that passengers are frequently transferred in that way (*i. e.* from boat to skiff, in the river), but, in such cases, he gives one bell, for a stop; that the boat must always be brought to a standstill before the transfer is attempted; and that it is dangerous to attempt it otherwise. He further states, that, after blowing the whistle, he gave a "slow bell," so that he could bring the boat around, bow on, to the point below the mouth of the bayou, as it would be dangerous to make the landing without doing so; and that, just then, he heard a scream, to which he did not pay much attention, that the scream was, however, followed by cries of "stop her; back her; somebody overboard!" that he then rang the bell to stop and back, and that the engine, at once, stopped and backed, as the boat was moving, under the slow bell, at about two and a half miles an hour, and that he was unable to finish the landing and was obliged to let the boat drift ashore, below the mouth of the bayou; that he remained on the roof until the boat had drifted ashore and had come to a dead stop, and then went below and found Harrington in the fireroom, but did not see the young ladies in the water, nor did he see two men holding one of them in the water; and that, as between the statement, "one of the girls was still in the water, and two of the men were holding her, and I helped pull her on the boat," made by him, in giving testimony shortly after the accident, and the one which he now makes, he stands by his present statement, though made some two years later than the other because he has had time to think over it. He further testifies that, whilst he does not know which side the skiff was on, if it was on the left hand side, coming up, the side from which he heard the screams, and forward, it could have been pushed under the guards by reason of the turn which the boat was making, and that it was a dangerous place to enter the skiff; and that, if a person should get into it in such a position, the skiff would probably be pushed under the guards, and the person thrown out, either between the skiff and the boat, or on the outside of the skiff, but that the skiff could be kept out by a person in it. He further testifies that the young lady fell overboard about 150 yards below the mouth of the bayou, and that the Mermentau runs southwest, to the sea, but is within the ebb and flow of the tide.

Ed. Harrington was the fireman and testifies; that he was firing when the accident took place; that it is not true that he was holding

one end of the skiff and Captain Sweet the other when the young ladies got in; that he did not tell them to get in, or hear any one else do so, and that he did not know that they were going to get in; that he did not see them fall, but that, after they had fallen into the water, he helped to pull one of them aboard. He also testifies that, when the whistles were blown, he shut off the draft under the boiler and came out of the fireroom to see where the landing was to be made and to get ready for it,—handle the lines, etc.,—and that he was standing in front of the boiler when the accident occurred, the boat being near the middle of, and headed directly up, the stream, 200 or 250 yards below the mouth of the bayou, and moving at the rate of about three or four miles an hour—half speed—with the skiff about amidships, on the port side; and that, as they were rounding a bend, the skiff was pressed against the side of the boat.

John Wright testifies that he has known Harrington and Sweet since he was a child; that just before the accident he was standing on the boat, near the skiff, talking to Miss LeBlanc, and shook hands with her and said "good night," as she stepped into the skiff, but did not assist her in getting in; that the young man, Valsin, and the other two young ladies had gotten in, and that Miss LeBlanc then put her foot on the seat of the skiff and "slided into the river;" that she did not jump into the skiff heavily, but was stepping lightly and that the skiff went under the guards, and that "she just naturally slided;" that the boat was not running at the time, and that he does not know what caused the accident.

He further testifies that he saw no one holding the skiff, but that, just after the accident, he saw Harrington, near the head of the skiff, and Sweet standing in the middle of the boat, looking, as he supposed "for the girl," but that he did not see who pulled the young ladies out of the water; he also says that he saw Sweet coming from the engine room; that the accident occurred about five hundred feet below the mouth of the bayou; that the distance from the deck of the boat to the seat, upon which Miss LeBlanc stepped, was about eighteen inches; and that, prior to the accident, as he was talking to Miss LeBlanc, he was not noticing the people around him. There is some other testimony, most of it, including that of a witness named Cousins, of a purely negative character, which needs not be particularly commented on, the foregoing synopsis embracing all that we find necessary to the solution of the questions:

1.  Did Miss LeBlanc attempt to board the skiff upon the invitation of the officers of the boat, or by reason of her reliance upon their offers of assistance, whether express or implied, or upon the faith of provision made by them with reference to such attempt?

2.  Was the attempt dangerous, and were the precautions taken commensurate with the danger?

The irreconcilable conflict in the testimony given by the witnesses for plaintiffs and defendants, respectively, renders it necessary that the whole should be carefully analyzed with reference to the circumstances which led up to and surrounded this most lamentable affair, and with reference also to the relation which the several witnesses bear to the case, and to the litigants.

Considering first, the circumstances:

Valsin Stutes, accompanied by his two sisters and the other young ladies, had left their homes on the bayou to go to Lake Arthur in a skiff, which, being some sixteen or eighteen feet long, was quite large enough to have accommodated a larger party, and they expected to return by means of the same conveyance; in fact, so far as concerns the twelve miles which separate the mouth of the bayou from Miss LeBlanc's residence, it is not suggested that there was any other way for them to return, and, as a matter of fact, the survivors of the party, eventually returned in that way. Upon reaching Lake Arthur, they found that the "Olive" had brought down from Mermentau, a party of excursionists, and was going to make a trip out on the lake and, in the evening, return to Mermenteau, passing the mouth of the bayou on which they lived. Upon the invitation of Simon, who was one of the excursionists, but who wished to return up the bayou with them; they boarded the boat, in order, no doubt, to enjoy the novelty, as some of them had never been on a steamboat before; to participate in the excursion on the lake; and to enjoy that mode of travel, with the company on board, as far, on their way home, as the mouth of the bayou,— nothing else being contemplated, however, but that, from the mouth of the bayou, they should make the remainder of the voyage as they had come, by skiff. All this, we think, was made known to Captain Sweet, when Simon asked him to take the party as passengers, and the probabilities strongly support the testimony of Simon to the effect that it was understood between him and Sweet that, when they reached the mouth of the bayou, they would be transferred from the boat directly into the skiff, which the boat had in tow, instead of being put ashore

only that they might, then, re-embark in the skiff. The former method of transfer is shown to be quite common, is less troublesome to both boat and passengers, and, when properly directed, is accompanied by but little, if any, more danger than the other.

Beyond this, we find that, when the accident occurred, the boat was near the middle of the river, with the bow pointed straight up that stream, and, as we conclude, opposite to the mouth of the bayou. It is true that, upon this point, the evidence conflicts, some of the witnesses stating that the boat·was then below the mouth of the bayou, from 150 to 250 yards, but the physical fact, which is unquestioned, that, three days later, the body of the drowned girl, as also her umbrella, were found at the very mouth of the bayou, taken in connection with the fact that the boat commenced backing almost immediately after the accident, we consider conclusive; for, there is nothing in the record which would lead us to believe that the body would have drifted 150 or 200 yards against the current of the river, and still less to justify the belief that two objects, differeing so entirely, in form and substance, as a human body and an umbrella, and sinking, in from forty to sixty feet of water, would drift that distance, up stream, and be found, at the expiration of three days, at the same spot; and we can well understand that witnesses composing an excursion party returning at 10 o'clock at night, from an all day, fourth of July, celebration, would be more likely to note the position of a boat from which such an accident had happened after the excitement had somewhat subsided than at the moment.

There is no doubt that the captain knew that a party, of four ladies and two men, were about to get off the boat, for he testifies that he notified Simon that they were approaching the mouth of the bayou.

It is equally beyond question that he considered it the duty of the captain to see his passengers safe ashore, though he states that some one else usually represented him in the discharge of that duty. It appears, however, that the "Olive," a stern wheel boat, about ninety feet long, was, that night, carrying some sixty passengers, and that the officers and crew consisted of the captain, who also filled the berth of engineer, a pilot, a fireman, a negro cook, and two men who are said to have placed their services, in case of need, at the disposal of the captain, the one, being Maignaud, the proprietor of a saloon in Mermentau, the other, Hoffman, occupation not shown, both of whom, however, had remained on the roof, near the pilot house, from the time the

LeBlanc and Wife vs. Sweet et al.

boat left Lake Arthur, and had received no intimation that their services were needed to aid in the landing of passengers at the Queue de Tortue. It seems clear that the pilot could not have been expected to leave his wheel for that purpose, and it is not pretended that anything of the kind was expected of the cook, so that if such service was to be rendered, the captain and the engineer, both of whom were on the main deck, from which the passengers were to get off, were the men, and the only men, to render it. But, although quite a number of persons had assembled on the side of the boat to see the passengers get into their skiff, the captain testifies that he was in the engine room and knew nothing of it, and the fireman testifies that he was in front of the boiler, and was equally ignorant. Nevertheless, the captain was among the first to take hold of Miss Aube, having for his assistant, Adam Simon, who was standing beside the skiff when she fell into the water, and the fireman seems to have been about as promptly on the spot, to render the same kind of assistance, either to Miss Aube or to Miss Stutes; the captain, according to his version of the matter, coming from the engine room, thirty-five feet away, and having, first, stopped to shut off steam and reverse his engine, after the young ladies had fallen into the river, and the fireman having come from the bow of the boat, a distance equally great or greater. If our conclusion as to the place, in the river, at which the accident occurred be correct, the boat, at the moment of the accident, had already passed the point from which to head in to the shore for the purpose of making a landing, as she was then in the middle of the river, heading straight up stream, with her port side opposite the mouth of the bayou, whilst the point at which it is claimed that the landing was to have been made was the angle, constituting the lower shore of the bayou and the left, or west, bank of the river. The pilot claims that it was necessary to make something of a wide turn in order to effect the landing, and that it would have been dangerous to have done otherwise, though he was going up stream, with plenty of water, and a bluff bank to land against. Without undertaking to question this alleged necessity, we do not understand him to pretend that it would have been the proper thing to have passed the place of landing, and, having turned his boat, to have approached it from the upstream side. He says, also, that he had blown his whistle three times, which indicated that he intended to make a landing, and that he would not have blown it at all for a stop to let passengers off in the river; and it is no doubt true that he did blow his whistle, and, possibly, three times, but it is also true, as we think, that,

when the accident occurred, he had passed the landing place, and, though the boat had been slowed down, she was still in the middle of the river, with her bow pointing straight up stream, and her position gave no indication, whatever, that a landing was contemplated, or that anything else was to be done except slow down the boat.

Considering now, the opportunities which were afforded the different witnesses to obtain the information which they have given on the trial and their respective relations to the case and to the litigants, as also some further features of the testimony given by them.

The four who give the affirmative testimony, to the effect that Sweet and Harrington held the skiff whilst the young ladies got in, and that Harrington told them to get in, appear to be, entirely, without pecuniary interest, but, being actors, and directly concerned, in the matter of their transfer from the boat to the skiff, it seems likely that they should have been able to see better, and should have paid more attention to the arrangements by which that transfer was to be effected, and should be better informed concerning them, than bystanders, who took no such part, and had no such interest at stake. Of the witnesses on the other side, Sweet is one of the defendants, and Harrington, the other, is charged with having actively participated in carrying out the arrangements whereby a human life was lost, and, as a result, his employers, or former employers, are s ought to be made liable for something over $15,000. Michon, the pilot, gives no testimony concerning the holding of the skiff. It may be remarked, here, that Simon, together with several other witnesses, was under the impression that the engine had stopped entirely at the moment of the accident, and that, in testifying, he gave it, as his opinion, that the officers of the boat had done about as well as they could in the attempt to make the transfer, being unable to specify in what particular they were at fault. With regard to the testimony of Wright, it seems to us hardly likely, in view of the fact that he was so much engrossed in conversation with Miss LeBlanc, immediately before the accident, as not to observe other persons standing around him, and of the fact that, the instant after he had let go her hand, in saying good night, she and two other young ladies were precipitated into the river, and this witness stood there, as near, or nearer, to them than any one else, whilst they struggled for their lives, and yet, is unable to say who assisted either of them on to the boat, that he should be particularly relied on when he undertakes to say who was *not* present at the moment, or to testify, it being at night, and there

being a number of persons around him, that the captain appeared upon the scene from the engine room, rather than from any other place. His testimony, we think, is also open to criticism on other grounds. Being asked which of the officers he saw after the accident, he answers: "Captain Sweet" and the examination proceeds: "Q. Where was he? A. Standing on the boat, about the middle of the boat, when I saw him. Q. What was he doing? A. Looking around for the girl, I suppose. Q. He was in the middle of the boat? A. Yes, sir. Q. You mean the steam boat? A. Yes, sir; he was looking across the boat. Q. Did you see Harrington? A. Yes, sir. Q. Where was he? A. On the side of the boat. Q. Which side? A. On the Calcasieu side, where the girl was drowned. Q. Near the head of the skiff? A. Yes. Q. Which way did Captain Sweet come from, when you saw him cross the boat? A. From the engine room. Q. Engine room? A. Yes, sir. Q. How long was that after the accident? A. Just after. Q. Right afterwards? A. Yes. * * * Q. Did you see who pulled the girls out of the water? A. No, sir; I don't remember who pulled them out."

The witness had not stated that he saw Captain Sweet cross the boat, only that "he was looking across the boat," but he accepted the suggestion contained in the question which followed, and, after giving answers which fairly meant that, when he *first* saw Sweet, after the accident, that officer was "in the middle of the boat," looking across the boat, or around the boat, "for the girl," as he supposes, he undertakes to say that he saw him coming from the engine room. The testimony is irrational, and inconsistent with the facts. If the witness first saw Sweet in the middle of the boat, it was a mere guess, whether he had come from the engine room or elsewhere, but there was no time, or occasion, for him to have been in the middle of the boat, looking across for the girl. There was no doubt as to where "the girl" was and there is as little doubt that Sweet was among the first on the spot from which she had fallen, for he, and other witnesses, on both sides, swear that he was; so that, "right afterwards" (referring to the accident) Sweet was not looking across the boat, but was assisting in pulling another of his passengers out of the water, a part of the affair which entirely escaped the observation of the witness.

. These circumstances, together with the difficulty which we encounter in endeavoring to understand why this party of two men and four young ladies, situated as they were, should have desired, or attempted, to leave the boat, upon which they had been traveling, without the

knowledge, or assistance, of any of its officers, or employes, added to the fact that the testimony, which we have recapitulated, is positive and affirmative, on the one side, and negative on the other, force us to the conclusion that the captain and the fireman of the boat were the persons who were in immediate charge of the matter of her transfer, from the boat to the skiff, when Miss LeBlanc lost her life. Undoubtedly, she might have been SAFELY transferred, and might still have survived, notwithstanding that the boat was in motion, and notwithstanding that she received no warning of the extreme danger which would result in case the edge of the skiff, when she stepped in, should be caught under the guards. But the evidence establishes, beyond question that, in making the transfer, under such conditions, she must, necessarily, have been subjected to danger; and it also establishes that, although the peril was one which ought to have been, and was, known to the officers of the boat, they gave her no warning, but held the skiff, into which she was invited, in such a way that, when she put her weight upon it, the side nearest the boat was caught under the guards, and she was precipitated into the water. There was, and could have been, no sufficient reason for making the transfer as it was made, since it is conceded that it was attended with a high degree of danger, from which it might have been relieved, in part, if not wholly, by waiting until the boat had stopped; in which case, too, the probability of effecting a rescue, would have been greater, since, with a boat moving at the rate of even three miles an hour, a person falling into the water, at night, may be out of sight as well as out of reach before assistance can be secured, whilst it might well be otherwise if the boat were stationary. We are of opinion, therefore, that the means provided by the officers of the "Olive," for effecting the transfer of their passenger, Miss LeBlanc, were not commensurate with the danger to which she was subjected, and we fail to find anything in her conduct to relieve the owner of the boat from liability for the consequences.

"Reduced to the simplest form, the rule may be stated to be that the carrier is bound to exercise the strictest diligence, in receiving a passenger, conveying him to his destination, and setting him down safely, that the means of conveyance employed and the circumstances of the case will permit." Am. & Eng. Enc. of Law (2nd Ed.), Vol. 5, p. 558; see also Lehman vs. R. R. Co., 37 Ann. 707; Turner vs. V. S. & P. R. R. Co. *Ib.* 648; Summers vs. C. C. R. R. Co., 34 Ann. 145; Penniston vs. R. R. Co., 34 Ann. 777.

This rule states the obligation of the contract entered into by the defendants when they undertook to carry Miss LeBlanc from Lake Arthur to the mouth of the Bayou Queue de Tortue. We know that the passenger was not set down safely at the place of destination, and the defendants have failed to show that it was through fault of hers, and not of theirs.

There is a broad difference, it may be remarked, between the obligation of a carrier, to a passenger, and his obligation to a third person, complaining of a tort; the burden of proof, in the latter case, save where otherwise provided by statute, resting upon the complainant, to establish both the injury and the negligence which caused it. Such were the cases of Diekman vs. R. R. & S. Co., 40 Ann. 787, and some others, to which we have been referred by the counsel for the defendants. Whereas, it is sufficient for the passenger, suing on a contract for safe carriage to establish the contract and to show that he has not been safely set down at his destination, to throw the burden of explanation on the carrier. It is for the carrier, and not the passenger, to prove what negligence, and whose, prevented the fulfillment of the contractual obligation of the carrier.

Julieu vs. Captain and Owner Steamboat Wade Hampton, 27 Ann. 377.

Patton vs. Pickles, 50 Ann. 857.

Moses vs. R. R. Co., 39 Ann. 649.

The amount of damages which should be allowed in cases of this character always presents a question of difficulty. The evidence shows that the plaintiffs were put to an expense of fifty dollars, or more, in connection with the search for the remains of their daughter, and the burial; and, beyond that, they claim $900, as the value to them, at the rate of $15 per month, of the services of the deceased, from the day of her death for a period of five years; $1000 as the value to them of the filial offices and attention of the deceased; $5000 as the amount to which the deceased, herself, by reason of her suffering, was entitled at the moment of her death; and $5000, as punitory damages.

The daughter whom the plaintiffs have lost was an active girl, full of life and spirits, and of great physical vigor, who assisted in the work which was required about their country home, and they might reasonably have expected a continuation of that assistance, and of the filial and kindly offices which the deceased, as an affectionate daughter, owed to her parents. The plaintiffs are also entitled to recover the amount

which the daughter was entitled to recover at the moment of her death. Without undertaking to attribute a specific amount to each of these elements of the claim presented, we are of opinion that a total of $2500 should be allowed, and that the claim for punitory damages should be denied. There may be some doubt as to whether the suit should not have been brought by the husband, alone, but the question has not been raised and would have been of no practical importance, if it had been. We shall not, therefore, undertake to pass on it, but will give judgment in favor of both plaintiffs. As to the defendants, it appears that the boat belonged to Daniel E. Sweet and that Henry L. Sweet occupied the position of master and engineer. Under these circumstances, we find no reason for holding the latter liable.

For these reasons, it is ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and that there now be judgment in favor of the plaintiffs, Theoville, and Leonore, LeBlanc, and against the defendant, Daniel F. Sweet, in the sum of $2500 with interest, as prayed for, and costs in both courts. It is further ordered and adjudged that in other respects the demands of the plaintiffs be rejected.

Rehearing refused.