## VOLUME 118.

---

# CASES ARGUED AND DECIDED IN THE SUPREME COURT OF LOUISIANA.

---

### AT TERM BEGINNING FIRST MONDAY OF NOVEMBER, 1906.

---

(42 South. 575.)

No. 15,975.

SPURLOCK et ux. v. SHREVEPORT TRACTION CO.

(Nov. 26, 1906.   Rehearing Denied Jan. 7, 1907.)

1. CARRIERS — INJURY TO PASSENGER — BURDEN OF PROOF.

The burden of proof is on the carrier to show why the contract of safe carriage was not fulfilled. Thus, where a passenger fell from the platform of a street car and was killed, in consequence of the gate not being securely fastened, the question being as to whether the gate had been insecurely latched or was unlatched by the passenger himself, the burden of proof lies on the car company.

[Ed. Note.--For cases in point, see Cent. Dig. vol. 9, Carriers, §§ 1283, 1290.]

2. EVIDENCE—DEMONSTRATIVE EVIDENCE.

When a question arises as to the working of a mechanical device, for instance, as to whether it was possible for a certain link to stay insecurely on a certain knob, the safer plan is to produce the device itself in court and demonstrate its operation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 679, 680.]

(Syllabus by the Court.)

118 LA.—1

Appeal from First Judicial District Court, Parish of Caddo; Thomas Fletcher Bell, Judge.

Action by William H. Spurlock and wife against the Shreveport Traction Company. Judgment for plaintiffs. Defendant appeals. Affirmed.

Wise, Randolph & Rendall, for appellant. Thomas & Herold and Alfred Dillingham Land, Jr., for appellees.

PROVOSTY, J.   When the cars of the defendant company enter upon Texas street, which is a double-track street, the gates of the platforms are closed on the side of the other track, as a precautionary measure to prevent egress or ingress on that side. On the 25th of November, 1904, after dark, between 6 and 6:30 p. m., one of the cars of the defendant company, with another car or trailer behind it, entered upon Texas street at Spring street, two blocks below the corner

2

where stands the Opera House. The conductor says that on thus entering Texas street he closed the gate and fastened it. The two cars stopped in front of the Opera House. This is one of the most brilliantly illuminated spots in the city of Shreveport. Several persons boarded the cars, among them the 13 year old son of the plaintiffs and his elder brother; the latter carrying a basket. The younger boy did not go into the car, but remained on the platform—the rear platform of the front, or motor, car. The elder went into the car, deposited his basket, and came out again and joined his brother on the platform. The cars started, and the younger boy leaned or staggered against the gate, and, the gate yielding, he fell out backwards, catching in his fall and holding on with one hand to the handhold, which is on the rod that stands at the end of the dashboard and supports the roof of the rear platform. The movement of the car swung him around towards the trailer. He tried in vain to better his hold by catching also with the other hand. He was dragged a distance of 15 or 20 feet while he held on, and finally let go and passed under the trailer car. His fall caused a commotion among the passengers, on noticing which the conductor rang for an emergency stop, and the cars were stopped as suddenly as could be done. They had traveled about 80 feet. The trailer car had run over the boy, and so crushed him that, for all that could be known, he was dead when picked up. The gates of the cars are of iron lattice work. When not in use they are collapsed against the body of the car. For closing, they are drawn out, or stretched, towards the dashboard of the platform, and there fastened by means of a link thrown over a knob. Besides the lateral motion by which they are stretched out or drawn in, they open by swinging outwardly, like an ordinary gate.

The parents of the boy bring this suit in damages, both as heirs of their child and in their own right. The sole question in the case is whether the gate was insecurely fastened, or was unfastened by the lad himself.

Throughout the case the defendant carries the burden of proof, for the boy was a passenger on the car, and, as was said by this court in the case of Le Blanc v. Sweet, 107 La. Ann. 355, 31 South. 766, 90 Am. St. Rep. 303:

"There is a broad difference between the obligation of a carrier to a passenger, and his obligation to a third person, complaining of a tort; the burden of proof in the latter case, save where otherwise provided by statute, resting upon the complainant to establish both the injury and the negligence which caused it. Whereas, it is sufficient for the passenger, suing on a contract for safe carriage, to establish the contract and show that he has not been safely set down at his destination, to throw the burden of explanation on the carrier. It is for the carrier, and not the passenger, to prove what negligence, and whose, prevented the fulfillment of the contractual obligation of the carrier."

We do not think defendant has discharged this burden. Of those who profess to have seen the boy at the moment of the accident, three testify for plaintiff and two for defendant. We say five, because we eliminate the brother of the boy, who, by his statement that the gate stood open—a point on which the most charitably inclined could not admit that he might be merely mistaken—has thrown doubt upon his whole testimony. The three witnesses for plaintiff are at variance with each other in some minor particulars, but they agree upon the crucial point that the boy did not have his hands, or either of them, on the gate. If they are to be believed, the boy fell because the gate, while appearing to be securely closed, was not so in reality, which would make defendant responsible. If, on the other hand, defendant's two witnesses are to be believed, one of whom says that the boy was playing with the gate, opening and shutting it, while the other has it that the

boy was "monkeying" with the gate, then the boy himself caused the accident, and defendant is not responsible.

No suspicion can attach to plaintiff's three witnesses. There can be no doubt that they testified to what they thought they had seen, whether they had, in point of fact, actually seen or not what they testified to. Whereas even from the cold record, it is not so certain that defendant's two witnesses are entirely free from suspicion. The witness Nicholson, though an old resident of Shreveport and a former assistant superintendent of the defendant company, cannot name a single person whom he saw or who saw him on that occasion, except one man, who has since died; and he accounts strangely for his whereabouts immediately after the accident by saying that he got off of the car and into the buggy of this same man, now dead, and drove off. Although he says that he warned the boy against playing with the gate, and that, when the boy paid no attention to him, he touched him on the shoulder and remonstrated with him, and that the boy gave him the answer, "Oh! Go on!" he cannot remember such striking features of the boy's appearance as whether he was or not in short pants, whether he was dark or fair, had blond or black hair, or how he was dressed, or whether he had a basket in his hand. The witness Wells is a youth of 19, without occupation, except as usher at the Opera House, and the superintendent of the defendant company was seen, on the day before he testified, giving him a paper which, on cross-examination, turned out to be a copy of a statement said by the witness to have been made by him to the said superintendent and by the latter reduced to writing. This statement the witness appears to have memorized, and it contains the word "terminal," whose meaning he does not understand.

It is also not a little strange that these two persons, who would now know better or more than any one else, did not figure as witnesses on the list which, doubtless, as is the invariable custom on such occasions, the agents of the railway company made of the possible witnesses of the occurrence; also that they were not known to be witnesses when, a few minutes after the occurrence, the sheriff made an investigation to ascertain whether there was any criminal responsibility; and, finally, that they did not figure as witnesses at the coroner's inquest. Their explanation of their reticence immediately after the occurrence, when it was in human nature to have spoken, is not very satisfactory. The witness Wells, for instance, bethought him at once that there would be a suit in damages, and kept silent for fear he might be called as a witness.

Defendant sought to prove by testimony that it was not possible for the link to stay upon the knob half way or insecurely. If such was the case, defendant should have put the matter beyond question or doubt by producing in court, as is often done in such cases, the contrivance itself, and demonstrated its working, though, by what we here say, we do not mean to intimate that, had this been done, the case would necessarily have gone differently.

The jury saw and heard the witnesses, and were better judges than we can be of their credibility. We see no reason for overthrowing their verdict. The amount allowed, $7,500, is not excessive.

Judgment affirmed.