## ALFORD et ux. v. BISSO FERRY CO., Inc.*
### No. 16031.

Court of Appeal of Louisiana. Orleans.
May 27, 1935.

Gordon Boswell, of New Orleans, for appellant.

St. Clair Adams & Son, Albert B. Koorie, and Lionel J. Bourgeois, all of New Orleans, for appellees.

LECHE, Judge.

Mrs. Abbie Landry, wife of Henry W. Alford, and said Henry W. Alford, brought this action against the Bisso Ferry Company, Inc. A trial by jury resulted in a verdict in favor of Mrs. Alford in the sum of $3,000 and in favor of her husband in the sum of $599, and, pursuant thereto, judgment was rendered in favor of plaintiffs, from which the defendant ferry company has appealed to this court.

The Bisso Ferry Company, Inc., is the owner and operator of what is commonly known as the "Jackson Avenue Ferry." This ferry transports passengers and vehicles across the Mississippi river, having a landing at the foot of Jackson avenue in the city of New Orleans and one across the river at the foot of Copernicus street in the city of Gretna. One of the steamers engaged in this service is the Edward Bisso. It is alleged that on March 19, 1932, at about the hour of 10:00 a. m., Mrs. Alford entered the ferry house of the defendant company at the foot of Jackson avenue in the city of New Orleans, paid the established fare, and boarded the Edward Bisso, which, at the time, was receiving passengers and vehicles for transportation across the Mississippi river to the city of Gretna; that the crossing was safely negotiated and the Edward Bisso was made fast to its customary landing place on the

*Rehearing denied June 24, 1935.

Gretna side of the river; that when the landing and mooring operations were completed the passengers on board the steamer proceeded in the usual way and in accordance with the directions of the attendant to leave the ferry boat by stepping onto the landing pontoon and proceeding thence to the gangway which connected the pontoon with the ferry house on the levee; that Mrs. Alford was among the last three passengers to alight from the steamer onto the landing pontoon, and that she followed the preceding passengers to the gangway, which leads to the ferry house; that upon reaching the apron, connecting the gangway with the pontoon, and stepping thereon, a sudden, violent movement of the pontoon threw her in a prone position across the apron, and similarly threw another passenger at the same time, all resulting in the injuries which are specifically alleged in the petition. The petition further sets forth that the accident and resultant injuries were caused solely and entirely by the gross carelessness and negligence of defendant and continues:

"XV. Your first named petitioner specially avers that said accident was due more particularly to the manner in which a derrick, owned and operated by the defendant, was effecting repairs to the pilings supporting the pontoon which at the time of the accident was used as the landing (place) of the 'Edward Bisso,' in that the said derrick employees of defendant, failed to warn the passengers alighting from the 'Edward Bisso' onto the pontoon of impending danger and that as a result of such failure to warn either on the part of the crew of the derrick or that of the 'Edward Bisso' your petitioner was permitted to walk onto the said pontoon and connecting apron at the very moment when one of the operations of the said derrick caused the pontoon to move suddenly and violently and causing plaintiff to fall as aforesaid."

An accurate description of the landing place is contained in the record by way of testimony and photograph and is constructed as follows: The ferry house proper adjoins the levee, its floor being approximately of the same elevation as the top of the levee. The rear portion of the ferry house extends out over the river, and is supported by piling of a height sufficient to protect the building from the river at its highest stage. From the rear of the ferry house, extending out into the river, is the gangway, which is also supported by piling but so constructed that its level, or height, may be altered or adjusted by means of chains and screws to accommodate it to the different stages of the river. The change of elevation by this means is only effected to adjust the gangway to the extreme high or low stages of the river, and, once made, is permanent until again altered. In front of this gangway is the landing pontoon, a large, rectangular shaped barge surrounded on three sides by clusters of piling, to which it is made fast by means of chains, or cables, and which, being afloat, accommodates itself to the various stages of the river. It is on the side of this pontoon nearest the thread of the stream that the steamers land and are moored in receiving and discharging passengers. The deck of the landing pontoon, it appears, at the time of the injury complained of, was of a somewhat lower level than the gangway, and was connected thereto by means of an apron. The apron was of the same width and construction as the gangway and consisted of heavy boards attached to stringers. It was attached at the top to the end of the gangway by means of large iron strap hinges. The lower end of the apron rested on the pontoon, being held down by its own weight. In other words, the gangway was stationary and the pontoon was afloat and was connected to the gangway by means of the apron. If the pontoon was lifted or lowered by the stage of the river, or rocked by waves or backwash, the foot of the apron resting upon it would move about by sliding on the deck, and its angle of incline would be increased or decreased as the pontoon was lowered or raised.

Mrs. Alford testified that she had been a resident of the city of Gretna for about eighteen years and, consequently, had used the ferry and its appurtenances many times, without mishap. She stated that at the time of the accident she was among the last passengers to leave the ferry, being followed by Mr. William Durr and Mr. Louis E. Durr; that she was in no hurry and leisurely crossed the pontoon and approached the apron; that she stepped upon the apron with her left foot and, as she picked up her right foot to proceed up the apron, the bottom board of the apron, which rested upon the pontoon, slightly raised, catching her right foot and causing her to fall forward on the apron; that Mr. Durr, who was in the rear of her and somewhat to the side, fell about the same time. She testified that she was assisted to her feet by Mr. Durr—which one she does not remember—and Mr. Alex Bisso, and was escorted to the ferry house and then to her home in Mr. Alex Bisso's automobile. When questioned as to what caused the

apron to rise, thereby tripping her, she said she surmised that it was the floating pile driver which was working between fifteen and thirty feet from the pontoon, but that she was not sure of this. She was only positive that the apron did rise slightly, causing her to trip and fall.

Mr. William F. Durr, an employee of the city of New Orleans and a totally disinterested witness, who did not know plaintiffs prior to the accident, testified that he and his brother left the Edward Bisso slightly in the rear of Mrs. Alford; that between fifteen and eighteen passengers had preceded them across the pontoon and up the apron; that as he approached the apron, a step behind Mrs. Alford, he saw her trip and fall; and that, at about the same time, he caught his toe on the edge of the board and also fell, striking the guard rail. He did not know what caused the board to rise, but ventured the opinion that the pontoon, being relieved of the weight of the fifteen or eighteen preceding passengers, rose slightly, causing the board to trip them. He testified that he did not fall on Mrs. Alford, but to the side of her and against the guard rail, and was positive that his toe caught in the edge of the board.

Mr. Louis E. Durr, another disinterested eyewitness and a brother of Mr. William F. Durr, testified that he left the ferry with his brother, both of them being slightly in the rear and to the side of Mrs. Alford and the last passengers to embark from the Edward Bisso; that he saw the lower board of the apron rise approximately two to three inches; saw Mrs. Alford trip and fall forward on her right arm, and, almost at the same time, saw his brother fall beside her; that he and his brother assisted Mrs. Alford to her feet and up to the ferry house. He testified that between fifteen and twenty-five passengers had preceded them up the gangway. He further stated that he noticed the pile driver some fifteen to twenty-five feet distant, but was unable to state whether or not it was in operation at the time of the accident.

On behalf of the defendant, Captain Alex Bisso testified that at the time of the accident he was aboard the floating pile driver, which lay between the pontoon and the levee some twenty-five feet distant from the scene of the accident; that he did not see Mrs. Alford fall, but his attention was attracted by some one saying a lady had fallen, and Captain Bud said, "You had better run over and see what's the matter"; that he boarded the pontoon and assisted Mrs. Alford to her feet. He testified that he did not see Mr. Durr

fall, and that he was already up when he got there. He was shown a photograph of the apron and gangway and testified that the length of the apron from the point where it was hinged to the gangway to the bottom board which rested on the pontoon was ten feet, and, by making a pin hole in the photograph, indicated approximately the point where he assisted Mrs. Alford to her feet. This point appears to be about five or six feet from the foot of the apron, which rests on the pontoon. He stated that he did not make an inspection of the apron and the place where Mrs. Alford fell at the time, but walked up the gangway and took her home in his automobile.

Mr. Leo B. Bisso testified that he saw Mrs. Alford fall and that she fell upon the apron. He also indicated by a pin point in the photograph the point at which plaintiff fell. According to this she fell somewhat nearer the toe of the apron, which rested upon the pontoon, than as indicated by Captain Alex. Bisso. He testified that he built the apron, which was about fourteen feet long, and that it was patterned or modeled along lines which many years of experience had shown to be suitable. He said that Mr. Durr was walking behind Mrs. Alford when she fell, and in attempting to catch her, fell on top of her. He stated positively that Mrs. Alford and the Durrs were the last three people to leave the steamer and in this respect contradicts the testimony of Capt. Alex. Bisso that other passengers followed them. However, as we see it, this point is immaterial. This witness, it appears, was not directly behind Mrs. Alford and the Durrs, but was off to the side, or at an angle, and this, no doubt, explains why it appeared to him that Mr. Durr fell on top of her and also why it appeared to him that Durr was walking directly behind her.

Mr. Joseph A. Bisso, referred to as "Captain Bud," was aboard the floating pile driver when the accident occurred, and, upon hearing some one shout that a lady had fallen down, told Capt. Alex. Bisso to go and see what was the matter, and shortly afterward went to the scene of the accident himself. He did not see either Mrs. Alford or Mr. Durr fall down and did not know exactly how the accident happened. He testified however, that after the accident Mr. Durr told him that he had fallen upon Mrs. Alford but he did not state that Mr. Durr told him that he tripped on Mrs. Alford, or fell because she fell. It may be that at the time, the falls being in such close proximity, Mr. Durr may have thought that he had pa.-

tially fallen upon Mrs. Alford, but nowhere in the record is it stated that Mr. Durr told any one that he tripped on Mrs. Alford, or stumbled over her as she fell. Capt. Bud (Joseph A. Bisso) did testify that he knew Mr. William F. Durr ten or fifteen years and thought that he was a truthful man. Therefore the only thing in the record which in any manner might be construed as indicating an interest in the case by Mr. William F. Durr was the fact that he was well acquainted with Capt. Bud (Joseph A. Bisso) and, as his testimony was on behalf of plaintiff and contrary to the interest of defendant, it must be taken as wholly disinterested and without bias.

Four persons, then, actually witnessed the accident, namely, Mrs. Alford, one of the plaintiffs, Mr. William F. Durr, his brother Mr. Louis E. Durr, and Mr. Leo B. Bisso, and their testimony, in our opinion, is contradictory only in so far as minor details are concerned and in so far as the powers of observation and description differ in different individuals. Mrs. Alford approached the apron and, as she stepped thereon with her left foot, the bottom board, or toe of the apron, which rested upon the pontoon by its own weight, and being unattached or unfastened thereto, slightly rose, catching her right foot and causing her to stumble, resulting in a forward fall onto the apron. Such a condition would not cause her to drop in her tracks, or necessarily cause her legs to buckle, dropping her on the spot, as her foot was not caught and held between the toe of the apron and the pontoon. On the contrary, the natural result would be to throw her forward and up onto the apron, as is usually the case when one stumbles forward, unless one foot is caught and held fast. When Capt. Alex. Bisso indicated a point on the apron at which he assisted Mrs. Alford to her feet, it would naturally be the point about where her head and shoulders would be, as it is not to be supposed that he would assist her to arise by taking hold of her by her feet. This fact would easily account for his indicating a point several feet above the toe of the apron. Similarly, this reasoning would apply to Mr. Leo B. Bisso, who indicated a point much closer to the toe of the apron than that indicated by Capt. Alex. Bisso, and the testimony in this respect of both of these witnesses is not at all inconsistent with that of Mrs. Alford as to how she fell. In fact, had she arisen without assistance, the natural tendency would have been to draw her feet and legs forward, toward her head and shoulders, rather than to push her body backwards toward the bottom of the apron. A most significant circumstance in connection with the occurrence is the fact that Mr. William F. Durr, who was slightly in the rear of Mrs. Alford and somewhat to one side, also fell in the same manner, namely, that the toe of the apron rose slightly, or to such an extent as to trip him. There may have been some doubt in his mind as to the cause of the toe of the apron rising, but there is apparently no doubt in his mind that it did rise and cause him to fall forward in the manner described. Unquestionably Mr. Durr fell very close to Mrs. Alford and perhaps partially upon her, as he stated to Capt. Bud (Jos. A.) Bisso after the accident. But there is absolutely nothing in the record to show that Mr. William F. Durr's fall was in any manner caused by the fall of Mrs. Alford. The significant point is that both of them fell at the same time, in the same place, and in a like manner, and nowhere in the record is this contradicted. It is substantiated by the other two eyewitnesses, Mr. Louis E. Durr and Mr. Leo B. Bisso. Mr. Louis E. Durr saw the toe of the apron rise three or four inches. Mr. Leo B. Bisso, who was midway of the pontoon some fifteen feet away at an angle, did not see the toe of the apron rise, but witnessed both falls, and no doubt, from his angle of observation, it appeared that Mr. Durr fell, or partially fell, upon Mrs. Alford, and likewise from his point of observation it may have appeared that Mr. Durr fell in reaching out to grab Mrs. Alford. It was only necessary for the toe of the apron to rise momentarily and but a few inches to cause this accident, and the momentary rising of the bottom board is easily explainable. The apron, as above described, consists of heavy boards nailed crosswise onto stringers; the apron itself being in effect a bridge, or flat surface, its top end being jointed horizontally to the gangway by heavy iron strap hinges. This would make the movement of the apron very much like that of a door if a door were laid horizontally instead of vertically. In other words, the apron itself was capable of moving in only two directions— either up or down—as a door is limited in its movements to opening or closing. Now, was the pontoon, upon which the toe of the apron rested, stationary and incapable of movement of any kind, it would indeed be hard to understand or explain how the toe of the apron could rise ever so slightly, as it is of heavy construction and rests thereon by its own weight. But the pontoon is not stationary. It is to all intents and purposes a floating barge, which can be swayed or moved

within certain limits by the swell, waves, or stage of the river. The ferry itself lands on the outer side of the pontoon, directly opposite the toe of the apron, and the bump or push of the ferry in landing moves the pontoon inshore, thus causing it to slide under the toe of the apron, having the same effect as if the toe of the apron moved slightly forward on the deck of the pontoon. This, in itself, would not cause the toe of the apron to rise, but that it could rise, and probably did rise, is obvious from the nature of the situation. A wave or back-wash from the river, striking the outer side of the pontoon, would have the same effect as the landing of the ferry, but a wave or back-wash striking the pontoon from the end, or at an angle, would cause one end, or one corner of the pontoon to slightly rise, which, at the same time, would cause the other end or opposite corner of the pontoon to lower or fall slightly. This would have the effect of causing the toe of the apron to rest upon the pontoon at its corner or end toward the end of the pontoon which was struck by the wave or back-wash. The other end of the pontoon, being lowered at the same time, would cause the deck of the pontoon to drop away from that end of the toe of the apron, causing the apron to lift several inches. In other words, while it is physically impossible for the toe of the apron to lift itself from the deck of the barge, it is entirely possible and probable that the toe of the apron can be lifted away from the deck of the barge, not by any movement of the apron, but by the movement of the pontoon itself, depending upon what angle the wave or back-wash, or swell, might strike the pontoon; the distance or space thus caused between the bottom board of the apron and the deck of the pontoon depending upon the nature and magnitude of the movement of the pontoon, bearing in mind that one end of the bottom board of the apron would always be resting upon the deck of the pontoon. This is apparently what happened in this case, as was found by the jury.

The only specific allegation of negligence contained in the petition is set forth in paragraph 15 thereof, hereinabove quoted. The movement of the pontoon resulting in the lifting of the toe of the apron, which caused plaintiff to fall, is attributed to the operation of the pile driver, which was located on the lower side of the gangway between the pontoon and the levee. We are convinced that the pile driver had nothing whatsoever to do with the accident. In the first place, it was in no way connected with either the pontoon or the gangway save by a loose board, one end of which lay upon the pile-driver barge and the other end of which lay upon the pontoon, and, being unattached to either, no shock or movement could have been transmitted through this board from the pile driver to the pontoon. Furthermore, Capt. Alex. Bisso and Capt. Bud (Jos. A.) Bisso testified that the operations of the pile driver were halted while the ferry was landed and that this was done deliberately for the protection of the passengers. Defendant contends that plaintiffs are restricted by the allegations of their petition to the specific acts of negligence alleged, but any evidence in the record which goes beyond the specific allegations of negligence was admitted without objection, and it is the settled jurisprudence of this state that the admission of such evidence without objection operates as an enlargement of the pleadings and may be properly considered by the court or by the jury in the determination of the issues presented. Morris v. St. Bernard Cypress Co., 140 La. 511, 73 So. 345; Zibilich v. Rouseo, 157 La. 936, 103 So. 269; Alston v. Moats, 13 La. App. 39, 127 So. 28; Milam's Spot Cash Wholesale House v. Nomey (La. App.) 154 So. 466; Rasberry v. Southern Advance Bag & Paper Co. et al. (La. App.) 151 So. 91; Eagle Rice & Feed Mills, Inc., v. Bourque (La. App.) 149 So. 891, and Kissgen v. Continental Casualty Co. (La. App.) 148 So. 732.

In the case of Le Blanc and wife v. Sweet et al., 107 La. 355, 31 So. 766, 772, 90 Am. St. Rep. 303, the following doctrine was laid down:

"There is a broad difference, it may be remarked, between the obligation of a carrier to a passenger and his obligation to a third person complaining of a tort; the burden of proof in the latter case, save where otherwise provided by statute, resting upon the complainant to establish both the injury and the negligence which caused it. Such were the cases of Deikman v. R. R. & S. Co., 40 La. Ann. 787, 5 So. 76, and some others, to which we have been referred by the counsel for the defendants. Whereas it is sufficient for the passenger suing on a contract for safe carriage to establish the contract, and to show that he has not been safely set down at his destination, to throw the burden of explanation on the carrier. It is for the carrier, and not the passenger, to prove what negligence, and whose, prevented the fulfillment of the contractual obligation of the carrier. Julien v. Captain and Owner Steamboat Wade Hampton, 27 La. Ann. 377; Patton v. Pickles, 50 La. Ann. 857, 24 So. 290; Moses v. R. R.

Co., 39 La. Ann. 649, 2 So. 567, 4 Am. St. Rep. 231."

The foregoing rule has been approved many times by our courts, particularly in the following cases: Jackson v. Natchez & W. Ry. Co., 114 La. 981, 38 So. 701, 70 L. R. A. 294, 108 Am. St. Rep. 366; Spurlock et ux. v. Shreveport Traction Co., 118 La. 1, 42 So. 575; Reems v. N. O. G. N. R. Co., 126 La. 511, 52 So. 681; Haynes v. La. Ry. & Nav. Co., 140 La. 1019, 74 So. 538; Hopkins v. N. O. Ry. & Light Co., 150 La. 61, 90 So. 512, 19 A. L. R. 1362. It will be noted, however, that the rule, as thus stated, has been explained in the case of Cusimano v. N. O. Public Service, Inc., 170 La. 95, 127 So. 376, 377. In that case the court said:

"What this court meant to hold in the Hopkins Case as also in Le Blanc v. Sweet, 107 La. 355, 31 So. 766, 772, 90 Am. St. Rep. 303, and Spurlock v. Traction Co., 118 La. 1, 42 So. 575, was that, where a passenger was not safely carried to his destination, the burden of proof was on the carrier to show that it was free from negligence. If the language of those cases goes beyond this, then it is too broad and should be restricted. * * *

"Our conclusion is that the doctrine of the Hopkins, Spurlock, and Le Blanc Cases is correct in so far as these cases hold that, where a passenger is injured, the burden of proof is on the carrier to show that it was free from any negligence which might have caused the accident, but that the doctrine of those cases is too broad (if such be their doctrine) in holding that the carrier can discharge such burden of proof only by showing how and why the passenger was injured, even though it does show that the injury occurred through no negligence of its own."

It will thus be seen that the burden remains upon the carrier to show that it was free from any negligence which might have caused the accident, and, having shown this, it is not required to go further by showing how and why the passenger was injured. The rule, as thus clarified in the Cusimano Case, was approved in Mays et al. v. Southwestern Gas & Elec. Co., 174 La. 368, 140 So. 826. In Bacon v. N. O. Public Service, Inc., 18 La. App. 96, 137 So. 213, 215, 866, this court said:

"Our courts have also held that, where a passenger brings suit against a carrier to recover damages for personal injuries, all he need prove is that he was a passenger on the car and that he was injured. It is then incumbent on the carrier, in order to relieve itself of liability, to prove either that it was not negligent, or that the passenger was contributorily negligent."

The burden of proof, then, rests upon defendant, not necessarily to show how and why the injury occurred, but to show at least that it was caused through no negligence of defendant, or to show affirmatively that plaintiff was contributorily negligent. The record does not sustain the plea of contributory negligence. It shows that Mrs. Alford was in no hurry, being among the last three passengers to leave the ferry, and that she was proceeding leisurely toward the ferry house when the accident occurred. The only two witnesses to observe her before the accident were the Durr brothers, and there is nothing in their testimony indicating that she was in any way negligent.

We are likewise of the opinion that defendant has not discharged its burden of proof by showing that it was free from negligence. It has often been held, and was so held by this court in Johnson v. Bisso Ferry Co., Inc., 13 La. App. 159, 127 So. 661, that the mere fact that the facilities used are in common use is not always enough and that such appliances or methods of construction as are usual does not relieve the carrier of negligence if the appliance or method of construction is inherently dangerous. It is entirely possible, and in fact probable, for the lower board of the apron to rise above the deck of the pontoon because of certain movements of the pontoon, as we have demonstrated above, and the fact that other passengers escaped this defect without injury is no defense. As has often been stated, a carrier is bound to exercise the strictest diligence in receiving a passenger, conveying him to his destination, and setting him down safely, that the means of conveyance employed and the circumstances will permit, and, while it is true that the carrier is not an insurer, it is bound to maintain safe and suitable landing places for the ingress and egress of its passengers. Nor does the argument that the injury in this case was one which could not have been anticipated apply here. In certain circumstances, where, of necessity, portions of a passageway must be at different but fixed levels, the situation is entirely different. There reasonable care on the part of the passenger would require that the difference in elevation be noted. But in this case the plaintiff certainly was not bound to anticipate that the apron would

rise as she stepped upon it, but defendant, being an expert ferryman, familiar with the circumstances and means of construction, was certainly in a position to anticipate such a movement occurring as its passengers were proceeding up the gangway.

Mrs. Alford suffered a severe and painful fall and was under the care of several of the most able physicians in the city of New Orleans. Dr. Roy B. Harrison testified that two and one-half years after the accident the use of her arm from the elbow down had not been restored and Dr. Edmund Connely thought that the injury was permanent. We are of the opinion that the award was not excessive and also that Mr. Alford has established his claim for expenses.

The judgment appealed from is therefore affirmed.

Affirmed

JANVIER, Judge (concurring).

I do not believe that the lower end of the apron or any part of it rose from the pontoon because, in my judgment, that was a physical impossibility. The apron was only a few feet in width, whereas the pontoon was a very long barge, and for one end of the barge to rise sufficiently to cause one end of the apron to rise from the deck of the barge would have required waves or undulations in the surface of the river much greater than could possibly have been caused by the normal winds or the normal wash of passing vessels. The apron itself is sufficiently flexible to compensate for the fluctuation of a few inches and to cause a fluctuation of a few inches where the apron touched the pontoon would have required a rise or fall of several feet on either end of the pontoon.

In fact, the petition contains no allegation that the end of the apron rose, but the charge when the petition was filed was that the pontoon was caused "to move suddenly and violently" and that this sudden movement caused plaintiff to fall as aforesaid. I believe that this is what happened, that the pontoon was suddenly moved either endwise or sidewise by the action of the water and that this sudden movement of the pontoon threw plaintiff from her footing.

I do not feel, however, that defendant has borne the burden of showing itself free from negligence and, therefore, agreeing with the result reached by my associates,

I respectfully concur in the decree.