(74 South. 538)

No. 21317.

HAYNES v. LOUISIANA RY. & NAV. CO.

(Feb. 12, 1917. Rehearing Denied March 12, 1917.)

*(Syllabus by the Court.)*

1. CARRIERS ⊕⇒290(1), 297 — PASSENGERS — PERSONAL INJURY—SPEED.

A railroad company is liable for an injury to a passenger occasioned by rapid traveling over slippery tracks, on a downgrade, over a bad roadbed; or by the breaking of an axle by reason of a defect therein, if the defect could have been discovered by the exercise of the utmost human skill and foresight.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1177, 1204.]

*(Additional Syllabus by Editorial Staff.)*

2. DAMAGES ⊕⇒132(4)—EXCESSIVE DAMAGES— PERSONAL INJURY.

A verdict of $2,000 awarded plaintiff, a man of 50 years, of robust constitution, earning from $2.50 to $4 a day, for injury resulting in inguinal hernia incapacitating him for hard work and reducing his earning capacity, would not be reduced.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 375.]

Appeal from Thirteenth Judicial District Court, Parish of Grant; James Andrew, Judge.

Action by A. H. Haynes against the Louisi-

ana Railway & Navigation Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Wise, Randolph, Rendall & Freyer, of Shreveport, and White & Thornton & Holloman and Thornton & Thornton, all of Alexandria, for appellant. Richey & Harper, of Jena, for appellee.

SOMMERVILLE, J. The mixed train of the defendant company, on which plaintiff was a passenger, was wrecked; and he suffered an inguinal hernia, with some bruises; for which he asked $11,000 in damages. The jury rendered a verdict in his favor for $2,000. Defendant appealed. Plaintiff, on his brief, refers to an answer to the appeal filed by him, in which he asked for an amendment of the judgment, and an increase to $5,000; but the answer is not found in the record.

Plaintiff charges fault and neglect on the part of defendant, and says that the wreck of the train and the injury to him were due to the bad and defective condition of the roadbed of defendant, which was known to the officers of defendant; and that the train was running at a high rate of speed.

In a supplemental petition, filed October 29, 1914, plaintiff alleged error in fixing the date of the wreck on July 14, 1913, and corrected it so as to read August 14, 1913.

In a second supplemental petition, filed February 1, 1915, plaintiff alleged as an additional ground of fault and negligence the breaking of an axle on one of the freight cars of the train, which also caused the wreck.

Defendant moved to strike out the amended petitions for the reason that they contradict, and conflict with, the allegations of the original petition, and change the issues there presented.

Defendant also pleaded the prescription of one year to the supplemental petitions.

The motion and plea were properly overruled. The amended and supplemental peti-

tions presented the same cause of action as was contained in the original petition. The first amendment was of a mere clerical error in stating the date of the accident to have been July 14, instead of August 14, 1913. The second, merely stated an additional cause of the wreck, and repeated the causes named in the original. There was no inconsistency in these amendments, which were regularly allowed by the district court.

When an amendment to a petition is allowed, it relates back to the filing of the suit; and the cause of action, when it is the same, is not prescribed, unless it was prescribed at the time the suit was filed. Roberts v. Leak, 108 Ga. 806, 33 S. E. 995; Southern Ry. Co. v. Horine, 121 Ga. 386, 49 S. E. 285; Belden v. Barker, 124 Mich. 667, 83 N. W. 616; Liebold v. Green, 69 Ill. App. 527; Illinois Central R. Co. v. Souders, 178 Ill. 585, 53 N. E. 408; Illinois Central R. Co. v. Souders (1898) 79 Ill. App. 41, judgment affirmed Chicago Ry. Co. v. McMeen (1902) 102 Ill. App. 318; Chicago City Ry. Co. v. McMeen, 206 Ill. 108, 68 N. E. 1093; Am. Dig. (Dec.) vo. Limitation of Actions, No. 127.

Defendant answered admitting the derailment of its train and alleged that the train was going at the rate of only 15 miles an hour; that the wreck was caused by the breaking of a journal of a freight car belonging to the Missouri, Kansas & Texas Railway Company; that the arch bar of that car dropped, causing the derailment after moving a distance of several hundred yards; that the car had been well constructed, and had been properly inspected before it became a part of defendant's train; and that the accident was unavoidable. It further answered denying that plaintiff had suffered a hernia, and that, if he did, he had failed to minimize the damage by resorting to an operation.

The evidence is very conflicting as to the condition of the roadbed of defendant at the place of the wreck, which is a branch road between Winnfield, in Winn parish, and Verda, in Grant parish. Plaintiff's witnesses testify that it was in a very bad condition, while defendant's witnesses testify to the contrary.

On cross-examination, the superintendent of track of defendant testified, in part:

"No, sir; I would not call it a good road. Not a first-class road. They were not supposed to run over it as a first-class road. The road was about the same average track as a majority of the new roads that have been built in the state."

The section foreman of defendant, on cross-examination, testified, in part, as follows:

"Q. This road is nothing like the main line of the Louisiana Railroad & Navigation Company, is it? A. It is not supposed to be, as there is nothing to make it except dirt. I mean it has not been graveled. Q. It is not supposed to be kept in the same condition as the main line? A. I mean that a man cannot keep it up with nothing but dirt to build it with. Q. You do not mean to say that this road is smooth and level like the ordinary railroad? A. Yes, sir; it was fairly smooth, about as good as ordinary dirt roads. Q. What do you call an ordinary dirt road? A. A road where you depend upon the dirt for filling in the roadbed and tamping up the ties. You see there is some places where the dirt is better than others. Where you strike a gravel country, the road will build up fairly good, and then, where you strike a clay or gumbo streak, it is hard to make the track stand up. Taking it as a whole, this track was fairly good. Q. Is it not a fact that during the year of 1913 this road was in a rotten condition? A. There were places on it that were."

The engineer of the train said:

"There are always some few bad places on a road like this."

The testimony is also contradictory as to the speed of the train. Plaintiff's witnesses testify that it was moving very rapidly, while defendant's train crew say that it was gliding along at about 10 to 15 miles an hour.

The testimony of the latter would seem to be more reasonable in view of the fact that the stopping places of the train on either side of the wreck were only about 2 miles apart. But the road was on a downgrade, the tracks were slippery because of rain, and the train was a heavy one.

The preponderance of evidence supports the allegations of plaintiff that the roadbed was in bad condition, and the train was moving too rapidly over such a track for safety; that several cars became derailed because of these conditions; that the wreck ensued; and that plaintiff was injured through the fault of defendant.

The breaking of an axle and the falling of arch bars may have contributed to the wreck; but it does not appear to have been the originating cause, as alleged by defendant. The jolting of the cars over ties and a bad dirt roadbed doubtless caused the axle to break.

The section foreman testified that the cars left the track before the axle broke, and that the arch bars dropped and tore up the track, which caused one car to block the track and precipitate the wreck. He says, in part, in answer to questions on cross-examination:

"Q. As a matter of fact, was not the track, and the ties and everything in general there, torn up considerably by this wreck? A. There was a good deal of damage done. Q. About how many ties were injured? A. I hardly know. We put in several. The cars ran a considerable distance on the ties before they began to damage them badly. It ran a little distance before it began to break the ties. When the journal dropped, it began breaking the ends of the ties off. Q. Then as a matter of fact, after this axle dropped down, the train ran for several feet knocking up things in general along there; did it not? A. Yes, sir; it must have run seven or eight rail lengths. Q. Was it not cutting off the ends of the ties all along there? A. Not as soon as they got off, but after the axle arch bars dropped down, then it began breaking off the ties. Q. About how far did it go before the car turned up and demolished the whole thing? A. It was about eleven rail lengths, as I remember, before it began to tear up the ties and track. Q. Then, after it did get to breaking up the ties, it tore up the track for three rail lengths; did it not? A. Yes, sir; that was about the amount of new rails we put in. Q. This wreck took on the magnitude of tearing up the track, breaking the ties off, and knocking down the dump in general; did it not? A. Tore up things pretty badly."

[1] The derailing of the cars and their going over cross-ties were sufficient to have caused the accident to plaintiff; or the subsequent wrecking of the train, because of the fallen arch bars, made it just as probable that plaintiff met with the accident to him because of a defective axle—both through the fault of defendant.

Defendant undertook to show that the defect in the axle was a latent one, that the car had been properly inspected, and that it was impracticable to have discovered the defect. The defect was shown to have always been in the axle, and that the crack was an old one. It was not shown that the original defect could not have been discovered by the car builder, and it was his duty to have discovered it, if that were possible, and to have rejected it at the time of the building of the car. The crack in the axle should have been discovered by a proper inspection.

In the case of Mary J. Morgan v. Chesapeake & Ohio R. Co., 127 Ky. 433, 105 S. W. 961, 15 L. R. A. (N. S.) 790, 16 Ann. Cas. 608, it was held:

"A railroad company is liable for injury to a passenger caused by the breaking of an axle by reason of a sand hole, if the defect could have been discovered by the builder of the car by the exercise of the utmost human skill and foresight."

And this is true even though the car belonged to another company.

In the case of Manser v. Eastern Counties R. Co., 3 L. R. (N. S.) 585, it was held that the defendant was liable for injuries sustained by the derailing of a passenger car in consequence of a latent defect in welding the tire of an engine wheel, which was not discovered by the application of a proper test when the wheel was new, but which might have been discovered by the carrier when the tire was reduced in thickness by being re-turned, by the application of the hammer test.

This court, in the case of Jackson et al. v. Natchez & W. Ry. Co., reported in 114 La. 981, 38 South. 701, 70 L. R. A. 294, 108 Am. St. Rep. 366, adopted the views expressed in

the above-mentioned decisions, and hold that:

"A railroad company will be held responsible for the injury to a passenger resulting from the collapse of one of its bridges, unless it can show that the bridge was as safe as the highest degree of practical care and skill could make a bridge of that class, and that, to the fullest extent that the highest degree of care and foresight could suggest, such bridge was inspected for discovering and remedying any defects that might have developed in it from the operation of the road or other causes, and, in case the defect was latent in the materials, then that the materials were thoroughly tested before being put in position."

See, also, authorities cited on page 995 of 114 La. on page 701 of 38 South., 70 L. R. A. 294, 108 Am. St. Rep. 366.

The burden of proof is on the carrier to prove the absence of negligence, and not on the passenger to prove negligence, where it is shown that a contract of carriage has not been fulfilled. Le Blanc v. Sweet, 107 La. 355, 31 South. 766, 90 Am. St. Rep. 303; Patton v. Pickles, 50 La. Ann. 857, 24 South. 290; Julien v. Wade Hampton, 27 La. Ann. 377; Moses v. Railroad Co., 39 La. Ann. 649, 2 South. 567, 4 Am. St. Rep. 231; Spurlock et al. v. Shreveport Trac. Co., 118 La. 1, 42 South. 575; L. Reems v. N. O. G. N. R., 126 La. 511, 52 South. 681; See Carriers, Cent. Dig. No. 1288, Dec. Dig. 316; C. C. art. 2232.

A carrier is bound to exercise the strictest diligence in receiving a passenger, conveying him to his destination and setting him down safely as the means of conveyance employed and the circumstances of the case will permit. See authorities cited above; also, 5 Am. Eng. Enc. (2d Ed.) 558; Lehman v. L. W. R. R. Co., 37 La. Ann. 707; and Turner v. V. S. & P. R. R. Co., 37 La. Ann. 649, 55 Am. Rep. 514; Summers v. C. C. R. R. Co., 34 La. Ann. 145, 44 Am. Rep. 419; Peniston v. C. S. L. & N. O. R. R. Co., 34 La. Ann. 777, 44 Am. Rep. 444.

A carrier is bound to exercise the highest

140 La.—33

degree of care to provide a safe roadbed, safe cars to transfer passengers, and to run at a reasonable rate of speed; and where negligent in either of these matters, and damages result to passengers, they are entitled to recover. Carriers, Dec. Dig. 280; Reems v. N. O. G. N. R. Co., 126 La. 511, 52 South. 681.

Where a wreck is caused by defective appliances used by a railroad company and injury results, it must be shown that it was as safe as the highest degree of practical care could make it in order for defendant to avoid liability. Jackson v. Natchez W. Ry. Co., 114 La. 981, 38 South. 701, 70 L. R. A. 294, 108 Am. St. Rep. 366; 4 R. C. L. § 268.

[2] Plaintiff was a man about 50 years of age, of a robust constitution, and followed the occupation of carpenter and builder. He earned from $2.50 to $4 per day, and was shown to be industrious. He sustained an inguinal hernia at the time of the accident, and he is compelled to wear a truss. He has been incapacitated for hard work, and his earning capacity has been much reduced. He suffered considerable pain at the time of the accident, and was confined for several days. He consulted two physicians; one of whom advised him to see a surgeon, and the other advised him not to have an operation performed, because of his advanced age.

He did not have an operation performed, when an operation might have minimized the damages. It is unnecessary to pass upon the question of whether an operation should have been submitted to or not to minimize the damages, in view of the amount of the verdict. In the case of Donovan v. Railroad Co., 132 La. 239, 61 South. 216, 48 L. R. A. (N. S.) 109, where plaintiff suffered a hernia and refused to follow the advice of her physician and have an operation performed, the court held that she should have minimized the damages by submitting to an operation, and the judgment was reduced from $6,000

to $3,000. The judgment for $2,000 in this case will not be reduced.

Affirmed.

O'NIELL, J., concurs in the decree.