No. 2250.
Second Circuit Appeal.

MRS. NEAL JOHNSON AND JESSIE JOHNSON v. MISSOURI PACIFIC RAILWAY CO.

(May 9, 1925, . Opinion and Decree.)

(*Syllabus by the Editor.*)

1. Louisiana Digest—Carriers of Passengers and Goods—Par. 42.

The burden of proof is on the carrier to prove the absence of negligence and not on the passenger to prove negligence where it is shown that a contract of carriage has not been fulfilled. (Civil Code, Arts. 2315 and 2232.)

2. Louisiana Digest—Carriers of Passengers and Goods—Par. 25, 34.

Where a sudden jarring of the caboose on a freight train threw the passengers to the floor, it is evidently more violent and severe than the jolting and bumping incident to the careful handling of a freight train. The railroad, having contracted to carry passengers and provide seats for them in a caboose is negligent if it so handles the train that the passengers are thrown out ·of the seats.

Appeal from Ninth Judicial District Court of Louisiana, Parish of Madison. Hon. F. X. Ransdell, Judge.

This is a damage suit for personal injuries.

There was judgment for plaintiff and defendant appealed.

Judgment amended and affirmed.

E. K. Boney, of Monroe, attorney for plaintiff, appellee.

Hudson, Potts, Bernstein & Sholars, of Monroe, attorneys for defendant, appellant.

ODOM, J. Neal Johnson and Jessie Johnson are wife and husband, respectively.

They brought suit against the defendant company to recover damages for personal injuries alleged to have been sustained by the wife, Neal Johnson, while she was a passenger for hire on one of defendant's freight trains.

They ask judgment in favor of the wife for $5,000.00 and in favor of the husband for $137.50.

As a cause of action they allege that on November 16, 1923, while plaintiff, Neal Johnson, was a passenger on one of defendant's trains she was:

"* * * violently thrown from her seat and her right arm fractured, sprained, strained and bruised and otherwise bruised and wounded in her person."

and that at the time she was pregnant and as a result of the fall she suffered a miscarriage, causing her to suffer and be sick and confined to her bed, unable to attend to her household duties, and that her health has been permanently injured.

She asked judgment in her own behalf in the sum of $5,000.00 for her pain· and suffering and for the miscarriage.

Her husband, Jessie Johnson, alleges that he spent for medical and surgical attention and medecine for his wife and for cooking and washing during the time of his wife's illness the sum of $37.50, and that by reason of the loss of the services of his wife and her companionship and· society he has been injured ,and damaged in the sum of one hundred dollars and he asks judgment in his favor for $137.50.

Answering, the defendant denied any liability whatever and set up that the train on which plaintiff was a passenger was a freight train, engaged principally in the carrying of freight "and sometimes carriés passengers in the caboose attached to said train" and that if the plaintiff was at the time of the injury riding on defendant's train she was traveling in said caboose and that she well knew that it was not provided with such accommodations as are provided for the comfort of passengers on regular passenger train; that she knew that such trains cannot be handled easily

and controlled so as to be free from jarring and shaking; and that she assumed the reasonable and ordinary risks incident to such mode of travel; and in the alternative, in case it should be found that plaintiff did receive the injuries alleged, then that such injuries were due solely to the negligence of the plaintiff in not keeping her seat and in not using such ordinary means as should be used by passengers for their own safety; and if the court should find that the defendant's employees were negligent in operating the train, then that through her own carelessness and negligence she contributed to the accident. And it pleads both assumed risk and contributory negligence.

There was judgment in the lower court for Neal Johnson, the wife, in the sum of $250.00 for her pain and suffering, and for Jessie Johnson in the sum of $153.75.

Defendant has appealed.

Plaintiff answered the appeal, asking that the judgment be amended so as to allow Neal Johnson, the wife, $350.00.

## OPINION.

The defendant company owns a line of railroad running from north to south through the Parish of Madison on which it operates a mixed train for the carrying of both freight and passengers. At times it carries the passengers in a regular passenger coach attached to its freight train and at other times they are carried in a caboose.

On the occasion of the alleged accident and injury the passengers were being carried in a caboose attached to the rear of a train composed of an engine and coal car, 44 freight cars, 39 of which were loaded, and a caboose. The trainload was very heavy, as a number of the cars were loaded with logs.

There were in charge of the train on this occasion a conductor named King and an engineer named Drennigan, and one or two other employees holding minor positions. Only one of these, King, was called as a witness. He testified that he had been connected with the operation of trains for 23 years, two years as an engineer and 21 years as a conductor. He says that he had known the engineer, Drennigan, for a number of years and that he is a very competent, careful handler of trains.

The caboose in which the passengers were riding on this occasion had two long seats, one on each side against the wall running lengthwise.

There were three colored passengers— the two plaintiffs and a four-year-old child, and two white passengers, Mr. I. B. Beard, who was called as a witness, and another man who we believe is a non-resident and was not called.

The colored people were seated on the seat on the east side and the white passengers on the west side of the caboose.

The plaintiffs live in Tallulah and on the morning of November 16, 1923, they went on defendant's train to Quimby, a station south of Tallulah, and spent the day.

In the afternoon of that day they took passage at Quimby on defendant's mixed train to return to Tallulah, and the accident complained of took place somewhere between Quimby and Tallulah.

Plaintiffs claim they purchased round-trip tickets at Tallaluh in the morning, but that is disputed by Mr. Gilbert, the agent. But it is immaterial whether they had round-trip tickets or one-way tickets; it is undisputed that at the time the alleged accident took place they were passengers for hire, they having purchased tickets for their passage in the usual course.

At some place between Quimby and Tallulah, not definitely located, a sudden jarring of the caboose threw both the woman, Neal Johnson, and her husband,

Jessie Johnson, from their seats to the floor. Whether it was a jerking of the caboose forward or a knocking of it backward is not clear. The testimony of the plaintiff would indicate that there were both a knocking of it backward and a jerking of it forward. Mr. Beard says: the "shake up" took place when the train stopped. None of the witnesses seem to have a very definite idea as to just how it happened, but whatever the motion it was very violent.

Plaintiffs were both seated. They were thrown out into the aisle and then to the floor. Mr. Beard braced himself with his left foot and was not hurt. The other white passenger had his arm thrust through a window and was hurt, though to what extent is not stated, probably but little. But it must have been an unusually severe and violent jolting and jerking of the caboose and it was evidently out of the ordinary. It was evidently more violent and severe than the jolting and bumping which are usual and incidental to the operation of freight trains while being carefully handled. We are convinced of this for more than one reason. These people were literally thrown out of their seats; they were not merely thrown over, they were hurled out of their seats into the aisle or toward the center of the caboose.

The very fact that the railroad company contracts to carry passengers in a caboose and provides seats for them shows that it is contemplated that the caboose will be so handled that its passengers can sit in the seats; and the fact that passengers do ride in cabooses shows that they are so handled that the seats can be safely occupied. Otherwise, no one would take passage on them.

If the caboose, in this instance, was handled as carefully as it could be, then it is impossible for passengers to occupy them with any degree of safety, and if they cannot be carried safely the carriers would not contract to safely carry and deliver them; and people would not be willing to hazard limb and life by accepting passage on mixed trains.

Travel on mixed trains is more hazardous than on passenger trains, and persons who take passage on them assume the extra risk, but the fact that railroad companies contract to transport passengers safely, and this they do when they accept them, shows that they expect to handle their trains in such a way as not to endanger those whom they contract to carry.

As stated, if the trains are to be handled so that passengers cannot stay in the seats provided for them, it is manifestly impossible to make them safe.

Furthermore, we think the testimony of Mr. Beard shows that this was an unusual "shock", although he does not say so. He is a passenger on this train once or twice a week and he had never seen any one thrown from the seats before. We think that the very fact that these passengers were seated and were thrown out of their seats and that one passenger had his arm thrust through a window and hurt and that one passenger who habitually rides these mixed trains had to brace himself in order to keep from being hurt make out at least a prima facie case of negligence on the part of the carrier sufficient at least to throw the burden on the defendant to prove the absence of negligence.

While it is true that travel on mixed trains is not as safe as that on passenger trains, it cannot be said that with the careful and prudent handling of freight trains passengers cannot sit on the seats provided for them.

In the case of Haynes vs. La. Ry. & Nav. Co., 140 La. 1019, 74 South. 538, the court said:

"The burden of proof is on the carrier to prove the absence of negligence, and not on the passenger to prove negligence, where it is shown that a contract of carriage has not been fulfilled."

Citing a long list of authorities.

See also: Hopkins vs. N. O. Ry. & L. Co., 150 La. 61, 90 South. 512.

In that case it was held that a carrier is bound to exercise the strictest diligence in receiving a passenger, conveying him to his destination, and setting him down safely that the means of conveyance employed and circumstances of the case will permit.

In the case at bar, plaintiffs were passengers for hire on defendant's train. The contract did not make the defendant an insurer of their safety but it did bind defendant to make them as safe as passengers could be made on a mixed train prudently and carefully handled, and the plaintiffs have shown that they made proper use of the appliances and accommodations furnished them and that they were not transported safely but were injured.

The burden was on defendant to show that its train on that occasion was handled as prudently and carefully as trains of that kind can be handled and that they were made as safe as passengers can be made on mixed trains operated under similar circumstances. The defendant has failed to discharge that burden.

The conductor, King, was called as a witness by defendant and was asked to explain just what the operation is in stopping a freight train, and he said: "In stopping a freight train there is always more or less some jarring on the rear end on account of the slack in the train. The air takes on the head cars first and the slack runs out and the train runs down until it gradually stops."

And he was asked:

"Q. Is it possible to stop a freight train with the use of air brakes on level country without more or less concussion or shock to the rear end?"

And he said:

"A. No, sir; not that I know of, that long."

And he was further asked:

"Is it usual for passengers to be thrown off their seats in the caboose?"

And he said:

"Yes, sir, lots of times."

But he does not say that they would be thrown off their seats if the train were prudently and properly handled.

If it be true, and we doubt it, that people are frequently thrown from their seats on this road, it by no means follows that such accidents would occur under proper management of the train.

Defendant pleads contributory negligence and says in brief:

"A passenger riding on a freight train who neglects to exercise ordinary and reasonable care to guard against jerks and jolts is guilty of contributory negligence, which bars his recovery."

And cites a long list of authorities and quotes from Elliott on Railroads, section 2476, page 204:

"The nature of the train may also have an important bearing upon the question of contributory negligence. As the passenger upon a freight train assumes the risks incident to that means of conveyance and must take notice thereof, he must exercise ordinary and reasonable care to guard against injury from such risks and must not voluntarily take a position where he is likely to be injured by a sudden jerk of the car resulting from the taking up of slack in the ordinary way or the like.".

But the plaintiff in this case did not "voluntarily take a position where she is likely to be injured by a sudden jerk of the car resulting from the ordinary taking up of slack in the ordinary way or the like".

She went into the caboose, took a seat and remained there until thrown out by a sudden, violent jerking or jarring of the caboose.

Counsel points out that plaintiff could read and failed to take note of the warning posted on the walls. That is true, but if she had read them and heeded them she would have done no more than she actually did without reading them. The testimony shows that the placard only warned passengers to remain in their seats. King the conductor says he warned passengers against standing in the caboose.

It has been held that where a passenger was sitting on the arm of a seat and thrown off, and where one was standing in a caboose and thrown down and injured by a sudden jerk of the train, he could not recover. But in this case the passenger did not assume any unusual or hazardous position in the caboose but did what the regulations and warnings provided that passengers should do—she sat down and was sitting down when the accident happened.

The record shows that Neal Johnson was holdng her four-year-old child between her knees, which counsel says was negligence. We do not think so. But assuming that it was, it does not appear that she would have been in any better plight if the child had been on her lap or on the seat by her side. She probably could not have remained on the seat. Her husband, Jessie Johnson, was on the same seat and was thrown out and knocked down and it does not appear that he was hampered in any way.

On the question of assumed risk, we find the law to be well settled that a passenger on a mixed train assumes the risk of injury from ordinary jars and jolts incident to the operation of such trains operated with due care and prudence in the usual manner.

Counsel on both sides have submitted most able and exhaustive briefs which have aided us much, but the following from 10 Corpus Juris, page 865, is a concise statement of the law applicable.

"In the operation of freight or mixed trains, somewhat greater peril is involved to passengers riding thereon than is involved in the operation of passenger trains, and hence a passenger on such a train assumes the inconveniences and additional risks that are usually and reasonably incident to transportation on such trains. This, however, does not relieve the carrier from exercising the same high degree of care that it owes to passengers on ordinary passenger trains, and this generally means the highest practical degree of care consistent with the operation of such train, taking into consideration the fact that, in the absense of statute, a carrier is not required to equip its cabooses like passenger cars, and that inconvenience and danger necessarily attend such mode of conveyance; and in some jurisdictions this rule of liability is expressly enforced by statute. Such passenger does not assume any risks from the lack of proper care on the part of the carrier; and if such care is not exercised by the carrier, and a passenger is injured thereby, the carrier is negligent and liable."

What we hold is, that the passenger in this case was not negligent, that she assumed no risk except that resulting from ordinary jars and jolts incident to the operation of the train with due care and prudence, that the very nature of the accident and the manner in which plaintiff was thrown from her seat and thrown down makes out a prima facie case of negligence sufficient to cast the burden on the carrier to show want of negligence; and the carrier having failed to show that the train was operated with due prudence and usual care, is held to have been negligent and therefore liable.

On the question of damages, we cannot say that the judgment appealed from is incorrect insofar as the amount allowed Neal Johnson is concerned.

Our learned and painstaking brother of the district court wrote an opinion both on the law and the facts. He was not satisfied that the accident brought about the miscarriage. Neither are we. The woman received injuries, suffered considerably and was confined to her bed for some time and not able to attend to her household duties for two months. Doctor Berry said she had a wounded arm which was calculated to give her pain and that he kept it bandaged for two weeks. She says that she was hurt on the side and arm and that her arm was bruised and sprained. She carried it in a sling for some time. The wound to the arm was considered of such seriousness that she was taken to Vicksburg and an X-ray picture made of it.

Our conclusion is that for her pain and suffering and inconvenience on account of this fall she is entitled to recover the amount which was awarded her by the district judge.

Counsel for defendant suggests that unless the court finds that the miscarriage was brought on by the fall, no award can be made for pain and suffering. It is not the pain and suffering resulting from the miscarriage that we are considering but that resulting from the bruise to the side and the bruise and sprain to the arm for which we think damages should be awarded.

As to the judgment in favor of Jessie Johnson, we think the amount should be reduced. He alleged that he had incurred expenses for medical and surgical attention and medicine for his wife and other expenses incident to the accident amounting to $37.50. He introduced proof without objection that he had expended $53.75, which amount was allowed him by the lower court. But there is no way by which we can tell what part of the drugs was used or what proportion of Doctor Berry's services were rendered in connection with the miscarriage. And for that reason we cannot allow for those items. We find, however, that he paid $19.50 for cooking and washing during his wife's disability, paid $8.50 for an X-ray picture of her elbow, and $8.50 to Dr. Street in Vicksburg, making a total of $36.50. The judgment will, therefore, be amended by reducing the amount allowed Jessie Johnson from $153.75 to $136.50, and as thus amended it is affirmed. The costs of the lower court to be paid by defendant and the costs of this appeal to be paid by plaintiff.