## JOHNSON v. CITY OF MONROE et al.[*]
### No. 5106.

Court of Appeal of Louisiana. Second Circuit.
Dec. 13, 1935.

J. Norman Coon, of Monroe, for appellant.

Harry H. Russell and W. A. Walker, Jr., both of Monroe, for appellees.

[*]Rehearing denied Dec. 31, 1935.

**TALIAFERRO**, Judge.

The city of Monroe, La., owns and operates, as a business enterprise, a system of street railways and busses within its territorial limits to serve and accommodate the public. Plaintiff boarded one of the city's busses about midevening, April 7, 1934, at the corner of Washington and North Eighth streets; paid her fare and had made two steps down the aisle towards seats in the rear of the bus, reserved for negro passengers, when she was thrown violently to the floor on account of the bus being suddenly brought to a stop about the center of the intersection of the streets. She suffered serious and painful injuries, and brings this suit against the city and G. C. Kelly, its employee, who was operating the bus, to recover damages.

The bus was going easterly on Washington street. Plaintiff hailed it and got aboard after it had stopped against the curb on south side of the street, a few feet from the corner on North Eighth street. This street intersects Washington at right angles. When plaintiff was inside the bus, the conductor closed the door and put the bus in motion towards the intersection. A Ford coupé, driven by an old negro man, was, at this time, approaching from the east on Washington street. He undertook to negotiate a left turn into North Eighth street and the two vehicles collided about the middle of the intersection. The collision was not violent, but the sudden checking of the bus' momentum by application of its brakes was sufficient to cause plaintiff, who weighed 250 pounds, to lose her balance and fall backwards to the floor. The left front part of the bus contacted with the right front fender and wheel of the coupé, inflicting minor injuries thereto. Both vehicles stopped at point of collision. Neither was traveling rapidly.

When plaintiff boarded the bus, she handed the conductor a 25-cent piece for him to change so that she could deposit 5 cents, the required fare for her passage, in the metal fare box attached to an iron post to the right of the conductor's seat. This box is two feet above the floor level. Just what the conductor did, or did not do, with regard to putting the bus in motion and keeping a close lookout ahead, while he was making the change for plaintiff and placing the 25-cent piece in proper depository, is a matter of serious dispute, and thereon hinges the question of liability or nonliability of the defendants. She alleges that when Conductor Kelly accepted the 25-cent piece from her he looked downward (towards a metal receptacle containing small change) in order to get for her the proper change, and that while engaged in doing this he started the bus forward towards the intersection; that he continued to look downward as the bus moved forward and drove same into the intersection without seeing where he was going or observing the dangers about him; that he had covered several feet of the intersection before he did direct his attention towards traffic ahead of him, and when he did so he observed the Ford coupé making the left turn in front of, and only a few feet from, the bus, too close to avert a collision. The specific acts of negligence charged to the conductor, which, it is alleged, render him and the city responsible for the results of the accident, are, viz.:

(1) That he failed to sound the horn of the bus when he started it towards the intersection after plaintiff boarded it; thereby violating an ordinance of the city of Monroe.

(2) That he should have kept the bus at stop on Washington street until the coupé had completed its turn into North Eighth street, and his failure so to do denied to the coupé its right of precedence to the intersection, and was in violation of section 41 of the city's traffic laws.

(3) That he should have allowed plaintiff time to reach a seat in the rear of the bus reserved for colored people, before starting the bus.

(4) That he failed and neglected to keep a proper lookout for traffic that might be ahead of him.

Other acts of negligence are charged against the conductor and the city which are here omitted because we deem them unimportant to a decision of the case.

In the alternative, plaintiff alleges:

"Your petitioner further avers in the alternative, and in the alternative only, that in the event this honorable court should hold that she is not entitled to recover damages on account of the alleged wrongful acts of the defendants, then, and in such an event, and in such an event only, she would and does hereby make demand of and against the defendant, the city of Monroe, based upon a breach of contract for its not having delivered her safely to her destination, and for the consequent

damages suffered by her by reason of said failure."

The city admits ownership and operation of the bus involved in the accident; that the conductor thereof was its agent and employee; and that plaintiff was a passenger for hire thereon when injured. It avers that said conductor, at time of and immediately preceding the accident, was operating the bus in a careful and lawful manner, and that as Washington street traffic has the right of way over traffic crossing same, he had a right of precedence to the intersection where the collision occurred; that the bus was brought to a sudden stop by the conductor out of necessity arising from the sudden turning of the Ford coupé, without signal or warning, into the intersection and across the path of travel of the bus; that the bus was suddenly stopped in order to avoid a serious accident by violently striking the coupé. All of the acts of negligence charged to the conductor are specially denied, and, of course, liability to plaintiff to any extent is also denied. Kelly denies any negligence on his part, and makes the same defenses, etc., as does the city.

Plaintiff's demands were rejected and her suit dismissed. She appealed.

■ The collision, as before stated, was not violent. The bus was in second gear, moving at not more than six miles per hour. It was stopped within two feet after application of the brakes. This being true, it is obvious that any inattention of the conductor, or the failure on his part to keep a proper lookout ahead for only a second of time, after the coupé undertook the left turn into North Eighth street, could and would have been a contributing factor to the accident; and if negligence of this character is proven, even though the operator of the coupé were also negligent, liability of the city follows. Plaintiff was a passenger for hire on the bus and the utmost human care and precaution were due her to see that she was safely carried to her destination. The city, to escape liability for her injuries and suffering, must be free of any sort of negligence as a contributing element to the collision.

There is some conflict between Kelly's version of the facts bearing upon the accident, in which he is to some extent supported by another witness for defendants, and the version thereof given by plaintiff and three other witnesses. In some material respects a witness for defendants corroborates plaintiff's witnesses' evidence.

The testimony of plaintiff's witnesses convinces us that the moment she got inside the bus and handed the quarter of a dollar to the conductor to change that simultaneously therewith he put the bus in motion, and while in the act of making the change, securing nickels from receptacles or cylinders in which they were carried, either on a belt about his waist or hanging within his reach, that his attention was momentarily directed from traffic conditions about the intersection, and that had this not been done the collision would have been averted. These witnesses all say that the conductor, from the time he started the bus towards the intersection until a fraction of a second before actual contact with the coupé, was looking down towards the floor of the bus or some part of it about him, presumably the receptacle containing change. Defendants' witness, Gentry, who was riding in the bus at the time, was in a position to see, and he says that he did see the accident in all its aspects. He testified that when the conductor handed plaintiff the change (the bus then being in motion) he turned "a quarter of the way around," and at that moment the coupé was turning into North Eighth street, and he (Gentry) holloed, "Look out." The brakes were applied instantly. He gave the following unequivocal testimony on the point, viz.:

"Q. You see the negro woman get on the bus and give the change to the conductor?

"A. Yes sir, I saw that.

"Q. Did you see him about the time she turned around to go away—did you see him look back over his shoulder and hand the change back to her?

"A. He turned slightly, I would say a quarter of the way around, and handed her change. Before he turned he looked up there and this traffic, if it would have been going to traffic rules, he had everything clear at the time he handed that change back.

"Q. I believe about the time he was looking back you hollered to him, 'Look out, Kelly', and he turned and looked and slammed on the brakes?

"A. Just as he started to turn back I hollered, 'Look out', although at that time he was still in the clear because he was on the right hand side. If the other car had been on the right hand side of the road he would still been in the clear.

"Q. Just before the accident the driver of the bus had his attention directed other than in front of him, and looking over his shoulder where he couldn't see what was ahead of him, and·it was you that was the one that first discovered an accident was going to happen?

"A. Yes sir, to my knowledge.

"Q. As soon as he turned his face and head back to the front he immediately applied the brakes, did he?

"A. Yes, sir."

Section 41 of the traffic laws of the city of Monroe is as follows:

"That at any street intersection where a left turn is not prohibited by this ordinance, a vehicle turning to the left shall have right of way over any vehicle proceeding across the intersection."

It is not contended that a left turn at the intersection of Washington and North Eighth streets was prohibited by any law of the city.

The coupé, as it approached North Eighth street, was in the lane of traffic along north side of Washington. There were cars ahead of it and some at its rear. Its driver states positively that before attempting the left turn he extended his hand horizontally in token of his intention to turn. He is corroborated in this statement by at least one witness who was on the bus; none positively denies that he made this signal. It would have bèen the natural thing to do to prevent the cars at his rear from running upon his car as he slowed down to make the turn. The signal was in full view of the conductor if he had been looking ahead. The driver of the coupé, under the plain letter of the city's law, had a right of precedence to the intersection, and had the right to assume that the bus would recognize his superior right in this respect. There is but one rational deduction to make in this connection, and that is that the conductor was not paying attention to traffic conditions ahead of the bus while making change for plaintiff. He violated a law in doing so, and this was the proximate cause of the accident, even though we grant that the driver of the coupé failed to exercise the degree of care and prudence he should have in attempting to negotiate the left turn.

██ In cases of this character, a plaintiff is only required to make out a prima facie case of negligence against the carrier. When such a case is made out, it then devolves upon the carrier to affirmatively establish lack of negligence on its part if it would escape the liability which the prima facie case, if not overcome, fastens upon it. Plaintiff here has done more than the law requires of her.

"The burden of proof is on the carrier to prove the absence of negligence, and not on the passenger to prove negligence, where it is shown that a contract of carriage has not been fulfilled." Haynes v. Louisiana Ry. & Nav. Co., 140 La. 1019, 74 So. 538, 540; Cusimano v. New Orleans Public Service, 12 La.App. 586, 122 So. 903.

█ Even though the negligence of the operators of the two vehicles· was concurring, defendants would be liable. McDonald v. Louisville & N. R. Co., 47 La.Ann. 1440, 17 So. 873.

█ We therefore conclude that defendants are liable in solido to plaintiff for the results of the accident to her.

### Quantum of Damages.

In falling, plaintiff's left shoulder struck violently the metal fare box attached to the upright post. She was unable, of her own efforts, to rise from the floor. The seriousness of her injuries manifested itself immediately. She sues for damages as follows:

Physical pain and suffering......$ 2,500.00
For severe mental and nervous shock and mental anguish.... 2,500.00
For permanent and total impairment and loss of use of her left shoulder, left arm and left hand, and consequent total and permanent loss of earning capacity and future profits, and total and permanent disability 15,000.00
For physicians' bills and medical expenses incurred to date on account of said injuries...... 50.00
Estimated amount of future medical bills and treatments...... 1,000.00

Total ...............·.$21,050.00

Plaintiff·was carried to a Monroe sanitarium immediately after her injury and remained there for two days. An X-ray picture then made of her left shoulder showed negative. She returned to her home and on the 9th of April, on account of pain and suffering, Dr. E. J. Young was called to examine and prescribe for

her. He found from physical examination some deformity of the shoulder, swelling and tenderness thereof, accompanied by pain. He strapped her shoulder with adhesive. He was called back that afternoon to relieve her pain. He then advised her to have additional X-rays made of the injured shoulder, which was done. He continued to strap her shoulder with adhesive tape. Later, he removed this tape and placed the arm in a sling. Dr. Young advised her to submit to an operation, which was badly needed. Being informed that she was not financially able to defray the expense of an operation, he advised her to go to the Charity Hospital, in New Orleans. She did this, arriving there on July 14th. She remained in bed there for six weeks before the operation was performed. Dr. Young was satisfied there was a dislocation of some joint or joints in the shoulder, before examining the X-ray pictures taken at his suggestion. He detected by physical examination a deformity of the shoulder joint and limitation of movement of the shoulder. The X-ray picture disclosed a dislocation of the acromio-clavicular joint, which, in the doctor's language, "is the attachment of the collar bone to the scapula," or shoulder blade. It also disclosed a dislocation of the "ligament that joins the upper third of the clavicular to the coracoid process."

Another picture was made of the shoulder the day before the case was tried (September 24, 1934). This one disclosed that the bones of the dislocated joint were being held together by two rounds of silver wire placed there when the operation was made in New Orleans. The position of the bones had improved some, but was not yet exactly normal. Dr. Lehman found a condition of osteoporosis of the acromial end of the clavicle. Osteoporosis is defined to be an abnormal porousness or rarefaction of bone by the enlargement of its canals or the formation of abnormal spaces. The doctor was of the opinion this condition would grow worse, and that the wire binding would cease to hold the bones in place; and that another and more serious operation would be imperative if recurrence of the condition existing prior to the first operation was to be prevented. He says the bone is getting worse and will not likely regenerate.

Dr. Young's prognosis of plaintiff's **case** is: "Very bad; grave." The final outcome of her injuries depends upon several factors, he said, "one is due to erosion of the end of the clavicle." He estimated there was a 50 per cent. decomposition of the end of this bone. He also said a second operation would become necessary. It was his opinion that plaintiff, under the most favorable circumstances, would be partially disabled the remainder of her life, and added, "maybe totally"; pain would likely continue the period of the disability. There is a possibility of ankylosis developing which would cause a stiffness of the shoulder.

Dr. Hunter corroborated the X-ray findings of Dr. Lehman and the pathological conditions found and testified to by Dr. Young. Defendants offered no expert testimony whatsoever. They concede that plaintiff was seriously injured and that she is now suffering from the effects thereof.

Plaintiff was a strong, robust woman, age forty-two, when injured. She followed washing and ironing for a living, and earned $10 per week. Her ability to engage in that line of work is wholly destroyed unless she is relieved by another operation, which will cost over a thousand dollars if performed by private surgeons. It is most probable she will go through life partially disabled and possibly the left shoulder may settle down to a condition of total disability, involving the arm and hand. This would not affect the normal use of the right arm and hand. No one can definitely forecast the result. At the time of trial and prior she was totally disabled to work. Many contingencies affect the chances of full recovery. The ultimate outcome of her case is necessarily uncertain. She has suffered a great deal of pain and still suffers therefrom, accompanied by head and back aches. The doctor frequently gave her drugs to relieve these conditions. She owes Dr. Young $150 for his services to her.

All things considered, we believe plaintiff entitled to $4,000 as damages.

For the reasons herein assigned, the judgment of the lower court is reversed, annulled, and set aside; and it is now ordered and decreed that plaintiff, Ollie Johnson, do have and recover judgment in solido against the city of Monroe and G. C. Kelly, defendants, for the sum of $4,150; with legal interest thereon from judicial demand until paid, and for all costs of court.